## STATE v. ODELL OAKLEY.

(Filed 15 June, 1936.)

**1. Burglary C d—Evidence held sufficient for jury on issue of defendant's guilt of burglary in the first degree.**

Evidence that the house of the prosecuting witness was broken into by twisting the knob off the locked door and forcing the door open, that the time was late at night, and that the prosecuting witness and his wife were asleep in the room entered, together with evidence that tracks in the freshly fallen snow were followed and led to defendant's room in another house in a distant part of the city, where defendant was apprehended, *is held* sufficient to be submitted to the jury on the question of defendant's guilt of burglary in the first degree. N. C. Code, 4232.

**2. Criminal Law I c—New trial is awarded in this case for inadvertent expression of opinion by trial court upon the evidence.**

In order to establish the identity of defendant as the perpetrator of the crime in this prosecution for burglary in the first degree, the State relied upon testimony that tracks at the scene of the crime were followed in the newly fallen snow to the room of defendant, where he was apprehended. The officer who followed the tracks did not measure them or compare them with defendant's shoes. While the officer was testifying regarding the tracks, the court asked the witness: "You tracked the defendant to whose house?" *Held:* Defendant is entitled to a new trial for the inadvertent expression of opinion by the court that the State had proven the tracks to be those of defendant, and the fact that the court immediately thereafter stated he did not mean to say "defendant," and asked the witness to whose house he followed "a set of tracks," does not cure the error, since the statement might have made a lasting impression on the jury to defendant's prejudice, and since the State's evidence was circumstantial and defendant was on trial for his life. The power of the court to withdraw incompetent evidence and instruct the jury not to consider it, distinguished. C. S., 564.

SCHENCK, J., concurs in result.

APPEAL from *Clement, J.,* and a jury, at January Term, 1936, of ROCKINGHAM. New trial.

The defendant was tried on the following bill of indictment:

"STATE OF NORTH CAROLINA—ROCKINGHAM COUNTY.
    SUPERIOR COURT, JANUARY TERM, 1936.

"The jurors for the State upon their oath present, That Odell Oakley, late of the county of Rockingham, on 29 December, 1935, about the hour of 12 in the night of the same day, with force and arms, at and in the county aforesaid, the dwelling house of one B. F. Sprinkle, there situate, and then and there actually occupied by one B. F. Sprinkle,

feloniously and burglariously did break and enter, with intent, the goods and chattels of the said B. F. Sprinkle in the said dwelling house then and there being, then and there feloniously and burglariously to steal, take and carry away, against the peace and dignity of the State. .

GWYN, *Solicitor.*"

The jury returned a verdict "That the said Odell Oakley is guilty of burglary in the first degree in manner and form as charged in the bill of indictment." Judgment of death was pronounced.

B. F. Sprinkle, a witness for the State, testified, in part: "I live in Reidsville, on Main Street, at the corner of Harrison Street. On 29 December, 1935, my house was broken into. There is a screen door and a locked door. The knob was twisted off of the inside door, which was locked. Then the door was forced open. The screen door opens on the outside and the other door opens from the inside. On the night of the 29th Mrs. Sprinkle and I were occupying the house alone. The breaking was done about 2 o'clock in the morning. I was sound asleep. Mrs. Sprinkle and I occupy twin beds. She sleeps with her head one way and I sleep with mine another. My head was next to the inside door, which comes out of the sun parlor into our bedroom. I was awakened by my wife's calling me. She said somebody was in our room and to get the gun. I heard him go out. When I awakened, it was snowing. It was snowing when the breaking occurred. In my opinion, when I woke up the snow was three inches deep. I called the police and Mr. Saunders and another gentleman came up there. I suppose it was fifteen or twenty minutes before Mr. Saunders came. He went right out and went on the track. No instrument was used in the breaking. The door was a little bit small for the frame and the lock didn't catch in too deep. The door knob was twisted off and the door shoved. The lock never did give, but the shove forced it open. The last thing Mrs. Sprinkle did before she went to bed was to lock that door. We went to bed at 9 or 10 o'clock and had been in bed four or five hours. I heard somebody go out of the door but I never did see who it was and don't know whether it was a man or woman. Nothing at all was taken. There were tracks on the doorstep, but I didn't measure them and I never went out of the house. The tracks on the steps looked like men's tracks. I pointed them out to Mr. Saunders."

Mrs. B. F. Sprinkle testified, in part: "When the noise woke me, I saw a man standing right inside the bedroom right at Mr. Sprinkle's head. I took a good look at him. He was apparently just standing up in the room. It was a man, had on a man's coat. It looked as if he were wearing a dark brown suit. I called Mr. Sprinkle three or four times before I could wake him and then he ran out the same door he

came in, through the sun parlor. Mr. Sprinkle called the police and Mr. Saunders came up. Mr. Saunders tracked the man. There was snow on the ground when I woke up. I saw Odell Oakley at the preliminary trial. That night I described to Mr. Saunders the man's appearance. Odell Oakley looks very much like the man I saw. In my opinion, he is the man. This breaking was Sunday morning. At the time I first saw Odell Oakley, I did not tell the officers that in my opinion he was the man. I only said he was a tall, slender boy. . . . At the preliminary trial I did not attempt to identify this boy as the man who was in my home."

J. T. Saunders testified, in part: "I am the officer who was on duty in the city of Reidsville the night of 29 December. It started snowing that night about 11 o'clock. By 2 o'clock the snow was about three inches deep. About 2 o'clock Mr. Sprinkle called me and another officer, Mr. Cobb, drove me up there. Mr. Cobb did not stay. I found a broken door, but didn't take time to examine it. Mr. and Mrs. Sprinkle pointed out to me tracks on the south side of the house on the step. Those tracks were a man's tracks and I followed them through town to Joe Martin's home, for about a mile and a half. I saw one other track on Lindsey Street going in the opposite direction. I saw the person who made that track. It was John Sommers, a white boy, and I spoke to him. Those two tracks did not get mixed up. They crossed, one man coming down on one side the street and the other the other, but they crossed and then they went on the opposite side the street. (The Court) They made by whom? Ans.: John Sommers and Odell Oakley. (Mr. Garrett) I object. (The Court) Well, you could not say. Don't consider, gentlemen, that he said the tracks made by Sommers and Oakley. You tracked the defendant to whose house? Ans.: Joe Martin's. (Mr. Garrett) You said the defendant. (The Court) I didn't mean to say the defendant; he followed a set of tracks to whose house? Ans.: Joe Martin's." To the foregoing questions and comments by his Honor the defendant objected, as being an expression of opinion. Exception. The witness continued: "When I got to Joe Martin's house there were no other tracks leading in to the house and there were no tracks leading away from the house. I saw no other tracks of any kind. This track went up in front of the house and went to the back and came back and up the front steps and right up the steps on the inside, leading into this room. I tracked the snow into the house. I followed the tracks right around the side of the house to the back and then he came back to the front, up the front steps on to the porch and went inside and up the stairway and into the first door after he got to the top of the stairway. . . . The tracks in the snow compared exactly with the defendant's shoes. There was no place where I followed those tracks

from Mr. Sprinkle's to the place where I found this man, where the tracks led off and away from any snow. I did not measure the tracks which I saw with this boy's shoes. I am just guessing. I did not ask for Joe Martin or try to arrest him. I didn't go there to arrest Joe Martin. I wanted to find the shoes that made that track. I do not know what kind of shoes Joe Martin wore. . . . I did not at any time measure Odell Oakley's tracks with those tracks in the snow. I trailed the man for a mile and a half, across streets, up streets with sidewalks and across and back across the street. I tracked him to five different homes, went on the porch of two of those homes and up to the windows of three and back out to the streets and down the streets. . . . All of these tracks were not exactly alike. The man didn't walk exactly straight and sometimes he would drag his feet a little. He walked sorter sideways. And when he walked sideways that threw some snow in the track."

The defendant denied that he was in the Sprinkle home, and said he left Allen Neal's barber shop about 11:00 o'clock and went to Joe Martin's home, where he was living. That he had been in bed about four hours when the officer came and woke him up. He was corroborated by Allen Neal and Jerome Bailey as to his leaving the shop about 11:30. On cross-examination he stated: "From 1924 to the present time they have had me in court ten or eleven times upon serious charges with terms ranging from three months to six years. They caught me every time I ever stole anything. During the last ten years I have visited from one city to the other." He told of the different offenses, where committed, and the time.

The defendant made many exceptions and assignments of error, and appealed to the Supreme Court. The only material ones will be considered in the opinion.

*Attorney-General Seawell and Assistant Attorney-General McMullan for the State.*

*Claude S. Scurry, Joe W. Garrett, and Sharp & Sharp for defendant.*

CLARKSON, J. At the close of the State's evidence, and at the close of all the evidence, the defendant made motions in the court below for judgment of nonsuit. N. C. Code, 1935 (Michie), sec. 4643. The court below overruled these motions, and in this we can see no error.

N. C. Code, *supra*, sec. 4232, is as follows: "There shall be two degrees in the crime of burglary as defined at the common law. If the crime be committed in a dwelling house, or in a room used as a sleeping apartment in any building, and any person is in the actual occupation of any part of said dwelling house or sleeping apartment at the time of the

commission of such crime, it shall be burglary in the first degree. If such crime be committed in a dwelling house or sleeping apartment not actually occupied by any one at the time of the commission of the crime, or if it be committed in any house within the curtilage of a dwelling house, or in any building not a dwelling house but in which is a room used as a sleeping apartment and not actually occupied as such at the time of the commission of the crime, it shall be burglary in the second degree."

Section 4233 : "Any person convicted, according to due course of law, of the crime of burglary in the first degree shall suffer death, and any one so convicted of burglary in the second degree shall suffer imprisonment in the State's Prison for life, or for a term of years, in the discretion of the court."

The evidence in the present case is circumstantial, although sufficient to be submitted to a jury. We consider the only material exception and assignment of error which has merit: The officer never measured or compared any of the tracks he followed and never measured or compared the shoes of the defendant with the tracks he followed. During the testimony of the officer who followed tracks, he testified that the tracks he was following crossed tracks made by John Sommers. Then it was that the court asked the question set forth above and made the statement to which defendant excepted and assigned error. It will be noted that immediately after telling the witness he could not say who made the tracks that the judge himself said, "You tracked the defendant to whose house?" This was not a question asked by the solicitor.

In *S. v. Bryant,* 189 N. C., 112 (114), speaking to the subject, we find : " 'No judge, in giving a charge to the petit jury, either in a civil or a criminal action, shall give an opinion whether a fact is fully or sufficiently proven, that being the true office and province of the jury; but he shall state in a plain and correct manner the evidence given in the case, and declare and explain the law arising therein.' C. S., 564. In terms, this statute refers to the charge, but it has always been construed as including the expression of any opinion, or even an intimation by the judge, at any time during the trial, which is calculated to prejudice either of the parties. *Morris v. Kramer,* 182 N. C., 87, 91. And when once expressed, such opinion or intimation cannot be recalled. In the case last cited, the court said : 'When the damage is once done, it cannot be repaired, because, as we know, the baneful impression on the minds of the jury remains there still. . . . One word of untimely rebuke of his witness may so cripple a party as to leave him utterly helpless before the jury.' *Bank v. McArthur,* 168 N. C., 48; *S. v. Cook,* 162 N. C., 586; *S. v. Dick,* 60 N. C., 440. It is also held that the probable effect or influence upon the jury, and not the motive of the judge,

determines whether the party whose right to a fair trial has been impaired is entitled to a new trial." *S. v. Sullivan,* 193 N. C., 754.

The expression of the court below, "You tracked the defendant to whose house?" we think prejudicial, and especially so as the evidence of the State was circumstantial. Although inadvertently made by the learned and able judge, yet we think the expression, even when followed by "I didn't mean to say the defendant," would make a lasting impression on the jury, who alone were the triers of the facts. Then, again, the defendant was on trial for his life, and this *lapsus linguæ* may have determined his fate.

The principle above set forth does not apply to the power of the court to withdraw incompetent evidence and instruct the jury not to consider it. *S. v. Stewart,* 189 N. C., 340 (344).

For the reasons given, we think the defendant is entitled to a
New trial.

SCHENCK, J., concurs in result.