STATE OF NORTH CAROLINA v. THOMAS A. McEACHERN

No. 45

(Filed 14 March 1973)

1. **Criminal Law § 99— question by court referring to rape — expression of opinion**

    In a rape prosecution wherein defendant contended that he engaged in intercourse with the prosecutrix with her consent, the trial court expressed an opinion in violation of G.S. 1-180 when he asked the prosecutrix "You were in the car when you were raped?" since the question assumed that defendant had raped the prosecutrix.

2. **Criminal Law §§ 85, 89; Witnesses § 5— character evidence — reputation in community outside of residence — competency**

    Evidence of good or bad character will no longer be confined to a person's reputation in the neighborhood or community in which he lives but may relate to such person's reputation in any community or society in which he has a well-known or established reputation; such reputation must be his general reputation held by an appreciable group of people who have an adequate basis upon which to form their opinion, and the testifying witness must have sufficient contact with that community or society to qualify him as knowing the general reputation of the person sought to be attacked or supported.

3. **Criminal Law § 86— general reputation of victim in Fayetteville — exclusion as prejudicial error**

    In this prosecution for rape and robbery, the trial court committed prejudicial error in the exclusion of testimony as to the victim's general reputation in the community of Fayetteville on the ground that the witness did not know what persons who resided in the victim's particular community in Fayetteville said about her character.

    Justice HUSKINS dissenting.

    Justice LAKE joins in dissenting opinion.

APPEAL by defendant from *Clark, J.,* August 22, 1972 Session of CUMBERLAND Superior Court.

This case was docketed and argued as No. 93 at the Fall Term, 1972.

Defendant was charged in separate bills of indictment with rape and common law robbery. The charges were consolidated for trial, and defendant entered a plea of not guilty to each charge.

The State's evidence tended to show that on the afternoon of the 13th of November, 1971, Nellie Sanderson went to the home of Mary Blue at 118 Teachers Drive in Fayetteville, North Carolina. She had formerly employed Mary Blue as a maid. Her visit on this day was for the purpose of obtaining some pecans. Mary Blue's son James, defendant, and his sister assisted in gathering the pecans, after which they all returned to the house. Mary Blue departed shortly thereafter, and Nellie Sanderson went to her automobile. When she started the motor, defendant ran to the automobile and struck her across the face with a pistol. She testified: "When I opened my eyes, I seen my bloody panties going out the window, and then is when I saw his black body. At that time Thomas McEachern was getting off my body. I don't know how much later that was after I had been struck."

Defendant forcibly pulled Nellie Sanderson's rings from her fingers and removed the watch from her wrist. He dragged her from the automobile and carried her back to Mary Blue's house. At that time she was bleeding from the face and from the vagina. She did not know how many times defendant hit her. On cross-examination Mrs. Sanderson denied that she consented to have intercourse with defendant.

Dr. Fernandez Rocha testified that he saw Nellie Sanderson, a 50-year-old white woman, on 13 November 1971, at about 8:50 p.m. His examination revealed multiple face and body bruises and profuse bleeding from a laceration in the vaginal canal. He could not testify from his examination that Mrs. Sanderson had had intercourse, but stated she told him that a Negro man beat her into unconsciousness, and that when she awoke she was being sexually assaulted.

Dr. Allen Merzi testified he saw Mrs. Sanderson at a later date. He described her injuries and concluded that normal intercourse would not have caused the injuries to her vaginal area.

Defendant offered evidence to the effect that he did have intercourse with Mrs. Sanderson, but that it was with her con-

sent and at her suggestion. He stated that while they were in the act of intercourse she started to bleed, and that they then started back to Mary Blue's house but had to stop because of a flat tire. He walked her back and, because of her drunken condition, she fell several times before they reached the Blue house. He did not rob or beat Mrs. Sanderson.

The jury returned verdicts of guilty as to each of the charges. The trial judge imposed a judgment of life imprisonment on the rape charge and a sentence of ten years imprisonment on the robbery charge. Defendant appealed and petitioned this Court for certiorari prior to determination by the Court of Appeals on the robbery charge. The petition was allowed on 27 November 1972.

*Robert Morgan, Attorney General, by James E. Magner, Jr., Assistant Attorney General, attorneys for the State.*

*Sol G. Cherry, attorney for defendant.*

BRANCH, Justice.

[1] Defendant contends that the trial judge violated the provisions of G.S. 1-180 by expressing an opinion as to his guilt.

During the prosecuting witness's direct testimony the trial judge asked the following question: "COURT: Let me ask you a question of clarification before you go any further, you were in the car when you were raped? A. Yes, sir."

This question was posed after Mrs. Sanderson had testified she had been rendered unconscious by defendant's blow, and after she stated she "saw this black man's body and my bloody pants going out the window."

On occasion, it is the duty of the trial judge to ask questions in order to clarify testimony or to elicit overlooked, pertinent facts. *Greer v. Whittington,* 251 N.C. 630, 111 S.E. 2d 912; *State v. Harvey,* 214 N.C. 9, 197 S.E. 620. However, the judge must be careful not to offend the provisions of G.S. 1-180. The terms of that statute are not confined to formal instructions to the jury, but prohibit expressions of opinion by the trial judge at any time during the trial. The statute is designed to guarantee to every litigant the right to have his cause considered with "the cold neutrality of the impartial judge and the unbiased mind of a properly instructed jury." Whether the

judge's language amounts to an expression of opinion is determined by its probable meaning to the jury, not by the judge's motive. *State v. Williamson*, 250 N.C. 204, 108 S.E. 2d 443; *State v. Canipe*, 240 N.C. 60, 81 S.E. 2d 173; *State v. Bryant*, 189 N.C. 112, 126 S.E. 107. Ordinarily, such expression of opinion cannot be cured by instructing the jury to disregard it. *State v. Cantrell*, 230 N.C. 46, 51 S.E. 2d 887; *State v. Winckler*, 210 N.C. 556, 187 S.E. 792.

One of the ways in which the trial judge may violate the statute is by posing questions which convey to the jury his opinion as to what has or has not been shown by the testimony of a witness. *Galloway v. Lawrence*, 266 N.C. 245, 145 S.E. 2d 861; *State v. Perry*, 231 N.C. 467, 57 S.E. 2d 774; *State v. Cantrell, supra.*

*State v. Oakley*, 210 N.C. 206, 186 S.E. 244, presents a situation analogous to instant case. There the State sought to identify the defendant as the person who had committed a burglary by offering testimony that tracks in newly-fallen snow were followed from the scene of the crime to defendant's dwelling, where he was later arrested. The officer did not compare the snow tracks with defendant's shoes. During the officer's testimony the court inquired: "You tracked the defendant to whose house?" The court immediately thereafter told the jury that he had not meant to say defendant.

This Court, holding this to be an expression of opinion requiring a new trial, in part stated:

"The expression of the court below, 'You tracked the defendant to whose house?' we think prejudicial, and especially so as the evidence of the State was circumstantial. Although inadvertently made by the learned and able judge, yet we think the expression, even when followed by 'I didn't mean to say the defendant,' would make a lasting impression on the jury, who alone were the triers of the facts. Then, again, the defendant was on trial for his life, and this *lapsus linguae* may have determined his fate."

An opposite result concerning an asserted judicial statement of opinion was reached in the case of *State v. Cureton,* 215 N.C. 778, 3 S.E. 2d 343. In that case a witness testified that defendant had shot the deceased four times, and then shot him the fifth time. The witness testified that when deceased was

going down defendant shot him again. The trial judge asked the witness:

" 'When did he (defendant) shoot him (deceased) the last time,' to which the witness replied: 'I don't know.' "

This Court, finding no prejudicial error, stated:

". . . The question propounded was tantamount to asking the witness where did you say the defendant shot the deceased the last time, and did not tend to lead the jury to believe that the judge had formed the opinion that the defendant did the shooting. And again, while up to this time the defendant by his plea of not guilty had denied that he was the person who shot the deceased, he later, as witness in his own behalf, admitted that he fired the fatal shots, but contended he did so in self defense. So, if there was error in the question propounded, it was rendered harmless by the subsequent admission by the defendant."

These two cases are distinguishable. In *Oakley* the court's question expressed an opinion that the tracks were made by defendant. This crucial proof had not been shown by other evidence. In *Cureton* the fact that defendant had shot the deceased was supported by ample evidence, and the judge's question only sought clarification as to when and where the shooting took place. The defendant did not deny that he shot the deceased and in fact later testified that he fired the fatal shots, but that he did so in self defense.

In instant case there was evidence which would support a reasonable inference that the defendant raped the prosecuting witness. However, the prosecutrix did not ever actually testify that she had been raped. Neither of the two medical experts subsequently offered by the State could testify that Mrs. Sanderson had been raped. Throughout the case defendant contended that he had not raped Mrs. Sanderson.

It is generally recognized that a trial judge wields a strong influence over the trial jury. "The trial judge occupies an exalted station. Jurors entertain great respect for his opinion, and are easily influenced by any suggestion coming from him." *State v. Carter*, 233 N.C. 581, 65 S.E. 2d 9. See also *State v. Frazier*, 278 N.C. 458, 180 S.E. 2d 128; *State v. Belk*, 268 N.C. 320, 150 S.E. 2d 481.

The question by the able and fair trial judge, although clearly inadvertent, *assumed* that defendant had raped Mrs. Sanderson. This expression of opinion might well have affected the verdict of the jury.

[3]   Defendant also contended that the trial judge erred in sustaining the State's objection to evidence relating to the character of the prosecuting witness. Apparently the objection was sustained because the witness, Elaine Williams, did not know what Mrs. Sanderson's "neighbors" or those who resided in Mrs. Sanderson's particular "community" in Fayetteville said or knew about her character.

We quote relevant portions of Elaine Williams' testimony:

"Q. Do you know Mrs. Sanderson's general character and reputation in the community—

MR. GRANNIS: Objection.

COURT: What community?

Q. Community of Fayetteville, your Honor.

MR. GRANNIS: I request a voir dire, your Honor.

THE JURY RETIRES.

Q. Do you know Mrs. Sanderson's general character and reputation in and around the community of Fayetteville?

A. Yes, I do.

Q. What is it?

A. I know that she likes colored men.

Q. What is her general character and reputation, is it good or bad?

A. It's bad as far as I know.

Q. I have no further questions."

\*   \*   \*

REDIRECT EXAMINATION By Defendant's Attorney:

Q. Have you ever heard other persons in the community discuss Mrs. Sanderson's reputation?

A. Lots of people have.

State v. McEachern

Q. Have you heard other people make comments about her reputation?

A. I have.

Q. And about how many have you heard make comments?

A. A lot of them.

Q. A lot of them?

A. Yes.

Q. And have those people given her a bad reputation?

A. Some of them talks, yes, plenty of people.

\*      \*      \*

EXAMINATION By Mr. Cherry:

Q. Do you know her general character and reputation in the community in which you live?

A. Which I was living at the time.

Q. What time?

A. In '67, Ray Avenue and Teachers Drive.

Q. Do you know her general character and reputation in the community and the area where Mary Blue lives?

A. Yes, that is the same.

COURT: Same as what?

A. Ray Avenue where I was living.

COURT: Do you know what her general character and reputation is down there?

A. Bad.

COURT: All right.

EXAMINATION By Mr. Grannis:

Q. Was this the reputation that she had in 1967?

A. Yes.

Q. That is what you are basing it on, isn't it?

A. It's not only 1967, it's been bad since.

Judge Clark sustained the State's objection and refused to allow the witness to testify as to Mrs. Sanderson's general reputation.

The general rule in North Carolina is that a person's character is proven by evidence of the general reputation he bears in the community or neighborhood in which he resides or has resided. *Johnson v. Massengill,* 280 N.C. 376, 186 S.E. 2d 168; *State v. Ellis,* 243 N.C. 142, 90 S.E. 2d 225; *State v. Bowen,* 226 N.C. 601, 39 S.E. 2d 740; *State v. Steen,* 185 N.C. 768, 117 S.E. 793. See 1 Brandis, Stansbury's North Carolina Evidence § 110 (Rev. ed. 1973). It appears this rule was first fully announced in the case of *State v. Steen, supra:* "In North Carolina the testimony of a character witness is confined to the general reputation of the person whose character is attacked, or supported, in the community in which he lives."

Prior to *Steen* many decisions had approved a qualifying question showing the witness to be acquainted with a person's general reputation without use of the geographic limitation "in his community" or "in his neighborhood." *State v. Mills,* 184 N.C. 694, 114 S.E. 314; *Edwards v. Price,* 162 N.C. 243, 78 S.E. 145; *State v. Ussery,* 118 N.C. 1177, 24 S.E. 414; *State v. Coley,* 114 N.C. 879, 19 S.E. 705; *State v. Wheeler,* 104 N.C. 893, 10 S.E. 491; *State v. Gee,* 92 N.C. 756; *State v. Laxton,* 76 N.C. 216; *State v. Speight,* 69 N.C. 72; *State v. Boswell,* 13 N.C. 209. See also, *State v. Parks,* 25 N.C. 296; *State v. Stallings,* 3 N.C. 300.

The Court in *State v. Smoak,* 213 N.C. 79, 195 S.E. 72, emphasized the qualifying phrase "in the community in which he lives" to reach the conclusion that evidence of the general character of a person among the employees of a railroad company was incompetent. See also, *State v. Hodgin,* 210 N.C. 371, 186 S.E. 495; 1 Brandis, Stansbury's North Carolina Evidence § 110, at 337 n. 98 (Rev. ed. 1973).

Subsequent decisions have created some confusion as to the meaning of "community" or "neighborhood" in determining whether a witness was qualified to offer proof of character by general reputation. Difficulties in interpreting and defining

State v. McEachern

those geographical limitations are highlighted in the cases of *State v. Bowen, supra,* and *State v. Ellis, supra.*

In *Bowen* a witness for the State was asked whether he knew the general reputation of the defendant "around in the Farmville community." The witness answered in the affirmative, and the court allowed him to testify that the defendant's reputation was bad. It was later shown on cross-examination that the defendant did not live in Farmville but lived six or seven miles from there and came to Farmville two or three times a week.

Defendant appealed and, relying on *Steen,* contended that since he did not reside in Farmville the witness was not properly qualified to testify as to his general reputation in the Farmville community. In finding no error the Supreme Court stated: "[W]e think the word 'around in the community' is comprehensive enough to include the neighboring rural regions in which defendant lives. The Court will take judicial notice of the size and location of the town of Farmville."

It seems the Court departed from the reasoning adopted in *Bowen* when it decided the case of *State v. Ellis, supra.* There the witness for the State attempted to testify as to defendant's character. When asked if he knew the defendant the witness stated that he knew him only when he saw him and did not know his general character. Upon being asked if he knew defendant's general character "from the esteem in which he is held in the community in which he lives, what the people generally say about him" the witness affirmatively replied and stated that defendant's character was bad. On cross-examination the witness said: "I don't know what [defendant's] reputation is in his community. I am not talking about just the Young community, but in my own immediate community. Yes, that is the Young community. I don't know what it is in the community in which he lives."

This Court held that this testimony was erroneously admitted and stated:

"Thus, this witness was permitted to testify that the defendant's character is bad, based not on his general reputation and character in the community in which he lives, but on what people generally say about him in the Young community where the homicide occurred. The witness, with-

State v. McEachern

out any limitation as to the community in which defendant lived or otherwise testified on direct examination that he did not know his general character."

The Court cited with approval the following:

"It is said in Greenleaf on Evidence, Sec. 461, 'It is not enough that the impeaching witness professes merely to state what he has heard "others say"; for those others may be but few. He must be able to state what is *generally said* of the person, by those among whom he dwells, or with whom he is chiefly conversant; for it is this only that constitutes his general reputation or character. And, ordinarily, the witness ought himself to come from the neighborhood of the person whose character is in question.' "

Urbanization and technological advances in communication and transportation have so affected modern living conditions that the viability of the strict neighborhood rule must be questioned.

"In a community where the ordinary person's home is under the same roof as his store or workshop, or where the stores, workshops, offices, and homes are all collected within a small village or town group, and one's working associates are equally the neighbors of one's home, there is but one community for the purpose of forming public opinion, and there is but a single capacity in which the ordinary person can exhibit his character to the community. In other words, he can there have but one reputation. But in the conditions of life today, especially in large cities, a man may have one reputation in the suburb of his residence and another in the commercial or industrial circles of his place of work; or he may have one reputation in his place of technical domicil in New York and another in the region of the mines of Michigan or the steel mills of Ohio where his investments call him for supervision for portions of time. There may be distinct circles of persons, each circle having no relation to the other, and yet each having a reputation based on constant and intimate personal observation of the man. There is no reason why the law should not recognize this. The traditional phrase about 'neighborhood' reputation was appropriate to the conditions of the time; but it should not be taken as imposing arbitrary limitations not appropriate in other times. 'Alia tempora, alii mores.'

What the law, then as now, desired, was a trustworthy reputation; if that is to be found among a circle of persons other than the circle of dwellers about a sleeping place, it should be received."

5 Wigmore on Evidence § 1616, at 488 (3rd ed. 1940). See Annot., 112 A.L.R. 1020; McCormick, Law of Evidence § 44, at 92, 93 (Cleary ed. 1972).

In 29 Am. Jur. 2d, Evidence, § 347, we find the following:

"The rule is broadly stated that evidence of the good or bad character of a party must relate and be confined to his general reputation in the community or neighborhood in which he resides or has resided. However, the term 'community' or 'neighborhood' is not susceptible of exact geographical definition, but means, in a general way, where the person is well known and has established a reputation, so that the inquiry is not necessarily confined to the domicil or residence of the party whose reputation is in question, but may extend to any community or society in which he has a well-known or established reputation."

[2]   We are convinced that inquiry into reputation should not be necessarily confined to the residence of the party whose reputation is in question, but should be extended to any community or society in which the person has a well-known or established reputation. Such reputation must be his *general* reputation, held by an appreciable group of people who have had adequate basis upon which to form their opinion. Of course, the testifying witness must have sufficient contact with that community or society to qualify him as knowing the general reputation of the person sought to be attacked or supported.

[3]   Elaine Williams answered the preliminary and qualifying question in the affirmative. The cross-examination on voir dire did not elicit such facts as would disqualify her from testifying.

In the case of *State v. Hicks,* 200 N.C. 539, 157 S.E. 851, the defendant was charged with violation of the prohibition laws. The State offered as a witness one Roy Pearson who was arrested at a whiskey still, and who testified that defendant had been with him and had employed him to operate the still. Defendant offered testimony regarding Pearson's bad character. As pertaining to defendant's witness, one Mims, the record shows the following:

"Amos Mims testified: 'I have heard some people discuss the character of Roy Pearson. Q. If they discussed his character, did they say what it was, good or bad? (State objects; objection sustained.) Q. Do you know what people in that community who discussed his character say about it? A. Yes. Q. Well, what is it?' State objects; objection sustained; defendant excepts. Witness would have testified that Roy Pearson's character was bad."

Holding it to be prejudicial error for the trial judge to sustain the State's objection to the testimony of the witness, Mims, the Court stated:

"The rule is, that when an impeaching or sustaining character witness is called, he should first be asked whether he knows the general reputation and character of the witness or party about which he proposed to testify. This is a preliminary qualifying question which should be answered yes or no. If the witness answer it in the negative, he should be stood aside without further examination. If he reply in the affirmative, thus qualifying himself to speak on the subject of general reputation and character, counsel may then ask him to state what it is. This he may do categorically, *i.e.*, simply saying that it is good or bad, without more, or he may, of his own volition, but without suggestion from counsel offering the witness, amplify or qualify his testimony, by adding that it is good for certain virtues or bad for certain vices. *S. v. Colson,* 193 N.C., 236, 136 S.E. 730; *S. v. Nance,* 195 N.C., 47, 141 S.E. 468. These requirements were met by the witness Mims, . . .

"But it is urged the defendant's guilt is so overwhelmingly established by the record, that an inadvertence in excluding the testimony of a character witness ought not to be regarded as capitally important. There are two answers to this position. In the first place, it is not conceded that the guilt of the defendant is conclusively established by the record. . . . Suffice it to say, the evidence is in conflict. In the second place, the credibility of witnesses is peculiarly a matter for the jury and not for the court. *S. v. Beal,* 199 N.C. 278, 154 S.E. 604."

Here, it was proper for defendant to offer evidence of the bad character of the prosecuting witness by showing her general reputation. Such evidence would be relevant to both charges. The

evidence was sharply conflicting as to the robbery charge and the question of consent in the rape charge. Since the jury is the sole judge of a witness's credibility, it was entitled to hear testimony concerning the prosecuting witness's general reputation.

Further, under the facts of this particular case, the evidence as to the charge of rape and as to the charge of common law robbery was so interrelated that error affecting the verdict in the rape case would, in all probability, affect the verdict in the robbery case.

For reasons stated defendant is entitled to a new trial on both the charge of rape and the charge of common law robbery.

New trial.

HUSKINS, Justice, dissenting.

I respectfully dissent from the majority view that the trial judge expressed an opinion prejudicial to defendant when he asked the prosecuting witness the following question: "Let me ask you a question of clarification before you go any further, you were in the car when you were raped? A. Yes, sir." It is obvious to me that the judge's question, as phrased, simply meant: "Are you saying you were in the car when you were raped?" In my judgment the jury so understood it. The trial judge was merely clarifying the testimony of the prosecutrix in regard to the *place* where the intercourse, whether by consent or by force, took place.

This interpretation is strengthened by the fact that defendant himself later testified that he had sexual relations with the prosecutrix with her consent and at her suggestion, thus admitting the act but denying the use of force to accomplish it. He also denied robbing or beating her and, seeking to explain her multiple facial and body bruises, said she fell several times due to her drunken condition while walking back to Mary Blue's house. Thus, on the rape charge, the only question really controverted before the jury was the question of force. The bruises, wounds and lacerations found on this woman's face and body by Doctor Rocha when he examined her strongly support the victim's testimony that she was beaten into unconsciousness and was being sexually assaulted when she awakened. Profuse vaginal bleeding, which no one denies, is further evidence of

force. In light of the undisputed physical facts, it is quite understandable that the jury did not accept defendant's version.

*State v. Oakley,* 210 N.C. 206, 186 S.E. 244 (1936), relied upon by the majority, is factually distinguishable. There, defendant was charged with burglary. In order to establish the identity of the burglar the State relied upon testimony that tracks at the scene of the crime were followed in newly fallen snow to the room of defendant where he was apprehended. While an officer was testifying regarding the tracks, the court asked the witness: "You tracked the defendant to whose house?" Defendant was awarded a new trial on the ground that the court inadvertently expressed an opinion that the State had proven the tracks to be those of the defendant. It is most significant that the defendant Oakley denied that he was at the burglarized home, said he went to his own sleeping quarters about 11 p.m. and had been in bed about four hours when the officer came and woke him up. Thus, the court's question assumes a special significance on the question of identity.

Here, defendant admits he was with Mrs. Sanderson, admits he had sexual relations with her, and admits that while they were in the act she began bleeding profusely. He simply denies the use of force, denies that he took her rings and watch, and denies that he beat her—notwithstanding all the physical evidence to the contrary. *State v. Oakley, supra,* does not fit these facts. Rather, I think *State v. Cureton,* 215 N.C. 778, 3 S.E. 2d 343 (1939), cited by the majority, should control.

The evidence in this case depicts a horrible assault by a nineteen-year-old black man on a fifty-year-old white woman. On contradictory evidence the jury convicted defendant of rape and common law robbery. It has been said that a defendant is "entitled to a fair trial but not a perfect one." *Lutwak v. United States,* 344 U.S. 604, 97 L.Ed. 593, 73 S.Ct. 481 (1953). In my view defendant's trial, although not perfect, was fair and free from prejudicial error. I vote to uphold the results of that trial.

Justice LAKE joins in this dissenting opinion.