STATE OF NORTH CAROLINA v. TONY MITCHELL SIDDEN AND ANTHONY RAY BLANKENSHIP

No. 487A84

(Filed 18 February 1986)

1. **Criminal Law § 89.1— character witness—knowledge or reputation**

The trial court in a first degree murder case did not err in permitting a witness to testify concerning an eyewitness's reputation, since the witness was familiar with the eyewitness's reputation in the community, and his testimony as to the eyewitness's character was based upon this reputation rather than upon the witness's opinion.

2. **Criminal Law § 89.1— character witness—statement of general reputation required first**

Though a witness in a first degree murder case should have been required to state that an eyewitness's reputation was "good" before proceeding to enumerate the character traits which accounted for the eyewitness's good reputation, no reversible error was committed by failure to follow this procedure.

3. **Criminal Law § 89.1— character witness—sufficiency of knowledge of present reputation**

There was no merit to defendants' contention that the trial court erred in denying motions to strike testimony of two witnesses concerning an eyewitness's good character because neither witness had sufficient knowledge of the eyewitness's present reputation upon which to rest an opinion, since testimony revealed that one witness did have sufficient contact with the community to afford her an adequate basis upon which to form an opinion, and defendants waived any error in the admission of the second witness's testimony by their failure to object on direct examination when it became clear that his testimony was not based on an assessment of the eyewitness's present reputation.

4. **Criminal Law § 89.1— character witness—statement about general reputation —testimony as to specific incidents of misconduct volunteered**

The trial court did not err in allowing an SBI agent to testify that one of the defense witnesses was known as "a large dealer in controlled substances, including marijuana and cocaine," since the agent was assigned to the county where the defense witness lived; the agent testified that he had known the defense witness for 17 or 18 years and that he was familiar with the general

character and reputation of the defense witness in the community in which he lived; and the agent could, after giving a categorical answer regarding reputation, of his own volition and without prompting from the prosecutor describe in what respect the defense witness's reputation was bad.

**5. Criminal Law § 79.1— statement of codefendant—admissibility as part of res gestae**

There was no merit to one defendant's argument that he was denied a fair trial by the State's failure during pretrial discovery to attribute to the other defendant a statement made at the crime scene because, had the statement been attributed to the other defendant, the first defendant would have been entitled to severance, since the statement in question would be admissible in the trial of either defendant as part of the *res gestae*. N.C.G.S. § 15A-927(c)(1).

**6. Criminal Law § 89.1— testimony about witness's reputation**

Testimony by a witness in a position to have heard discussions of a person's reputation that he has never heard anything bad about the person is testimony of good reputation and is admissible.

**7. Criminal Law § 89.1— character witness—failure to state general reputation first—no prejudice**

Though it was error to allow a character witness to testify that another witness had "drinking problems" and was "not real truthful" without requiring him first to state categorically that the witness's reputation was "bad," such error was not reversible where it was clear that the character witness was familiar with the witness's reputation and his description of it leads to no conclusion but that he thought it was "bad"; furthermore, evidence of the witness's drinking habits came in through testimony of another witness.

THE defendants were indicted on 15 November 1982 by the WILKES County Grand Jury for first degree murder. Venue for the trial was changed to YADKIN County and the defendants were tried jointly before *Judge James M. Long* and a jury at the 2 April 1984 Criminal Session of YADKIN County Superior Court. Each defendant was convicted of first degree murder. Following a sentencing hearing pursuant to N.C.G.S. § 15A-2000(b), the trial judge, upon the jury's recommendation, sentenced the defendants to life imprisonment. The defendants appealed to this Court as a matter of right pursuant to N.C.G.S. § 7A-27(a).

The State's evidence tended to show that the deceased, Gary Sidden, was murdered a few yards from his mobile home in the community of Hays, Wilkes County, North Carolina sometime between 10:00 p.m. and midnight on the evening of 21 July 1982. Dr. Modesto Scharyj, the pathologist who performed an autopsy upon Sidden's body on 22 July, stated that his examination revealed that the deceased had received two shotgun wounds, a contact

wound to the neck and pellet wounds to the back from a distant shot. Dr. Scharyj further stated that either wound would have caused death within one minute.

The State's principal witness was Claude Junior Johnson. Johnson lived in a tool shed on Gary Sidden's property about fifty feet from Sidden's mobile home. Johnson had been working at Sidden's produce stand for four months prior to Sidden's death. Johnson received no pay; in exchange for his work he was given free room and board, cigarettes and an occasional beer.

Johnson testified that on 21 July 1982 he retired for the evening at approximately 10:00 p.m. He stated that shortly after he went to bed in the tool shed he was awakened by what sounded like a shotgun blast. The area around the tool shed was well illuminated by several outdoor lights, but when Johnson first looked out the window he could not see anyone. About three or four minutes later, however, he saw defendant Blankenship run out of Gary Sidden's trailer holding what appeared to be a shotgun. A moment later Gary Sidden and defendant Tony Sidden ran out of the trailer. Johnson testified that he heard Gary Sidden begging for his life. Defendant Tony Sidden and Gary Sidden then wrestled on the ground next to the trailer for a few minutes. Gary eventually broke free and began to run toward the shed. Johnson said that defendant Blankenship then jerked up his gun and shot at Gary Sidden. For the next three to five minutes, the three men were out of Johnson's view. Johnson soon heard a third gunshot, and then he heard a voice say, "Let's go, Blondie. I think we've got him now." Johnson testified that Tony Sidden used to be called "Blondie."

The next morning Johnson reported to Ricky Sidden and Phil Allen, who were selling produce at Gary Sidden's stand, that Gary had been murdered the night before. Johnson testified that he waited until morning to tell anyone about the shooting because he was so frightened by what he had seen and heard that he hid under a rocker in the tool shed throughout the night.

The defendants introduced alibi evidence tending to show that they were not in Wilkes County on the night of 21 July 1982. Norma Jean Alexander, George Torrealba, Renee Torrealba, Charles Smith, Jean Ockert and Regina Hudson testified that the defendants were with them at a party in Wagram, North Carolina

on the evening of 21 July 1982 through the early morning hours of the next day. Defense witnesses estimated that it is approximately 200 miles from the Hays Community in Wilkes County to Wagram in Scotland County.

The defendant Blankenship testified in his own behalf. Blankenship stated that he and the defendant Tony Sidden, who was married to Blankenship's mother, left Wilkes County at about 7:00 p.m. on 20 July to go on vacation. They traveled to Wagram to meet Blankenship's mother and arrived at about 11:00 p.m. Blankenship testified that he and his family stayed with friends in Wagram for several days. Blankenship recalled seeing a news story while watching television there, during which Wilkes County Sheriff Kyle Gentry announced that murder warrants had been issued for Blankenship and Sidden. Blankenship, who was fourteen years old at the time of the murder, testified that he was frightened and that he convinced Tony Sidden not to return to Wilkes County. Thereafter, the defendants traveled to several states and finally settled in Kansas under assumed names. Blankenship and Sidden voluntarily returned to Wilkes County and surrendered to authorities on 11 September 1983.

*Lacy H. Thornburg, Attorney General, by Dennis P. Myers, Assistant Attorney General, for the State.*

*William C. Gray, Jr., for defendant Sidden.*

*Adam Stein, Appellate Defender, by Malcolm Ray Hunter, Jr., First Assistant Appellate Defender, for defendant Blankenship.*

BILLINGS, Justice.

## Defendants Blankenship and Sidden

The defendants jointly argue three assignments of error. Two of these assignments concern testimony by prosecution witnesses regarding Claude Johnson's reputation in the community, and the third assignment relates to testimony offered by SBI Agent Kenneth Sneed as to the reputation of George Torrealba, one of the defendants' alibi witnesses.

[1] The defendants first argue that the trial court erred by permitting Earl Gambill to testify concerning Claude Johnson's repu-

tation. The defendants object to Gambill's testimony on the ground that it was based upon *personal opinion* rather than a knowledge of Johnson's *reputation*.

The defendants correctly state the rule of law applicable to this issue. As this Court's recent decision in *Holiday v. Cutchin*, 311 N.C. 277, 280-81, 316 S.E. 2d 55, 58 (1984) makes clear:

> [W]hen character is only collaterally in issue, as it is when offered either to impeach or rehabilitate a witness, proof by witnesses other than the person whose character is in question may only be by evidence of reputation. *State v. Taylor*, 309 N.C. 570, 308 S.E. 2d 302 (1983); *State v. Cox*, 303 N.C. 75, 277 S.E. 2d 376 (1981); *State v. Grundler*, 251 N.C. 177, 111 S.E. 2d 1 (1959), *cert. denied*, 362 U.S. 917 (1960). Unlike proof of character when character is directly in issue, proof of character to impeach or rehabilitate may not be by opinion evidence or evidence of specific acts of the person whose character is in question. *See* 1 Brandis on North Carolina Evidence, § 113 at 419.20 (2d ed. 1982). Where character testimony is offered to prove another person's credibility as a witness, the testimony must be limited to that person's reputation.

*See also State v. Peek*, 313 N.C. 266, 328 S.E. 2d 249 (1985); *State v. McEachern*, 283 N.C. 57, 194 S.E. 2d 787 (1973); *State v. Hicks*, 200 N.C. 539, 157 S.E. 851 (1931).

With respect to the defendants' objections to Earl Gambill's testimony, we find that the record does not support their argument that Gambill was expressing a *personal opinion* about Claude Johnson's character. Gambill testified on direct examination that "if anybody knows [Claude Johnson's reputation in the community], I should know it." He further testified that Johnson's general character and reputation in Hays was "good." It is true that during cross-examination by defendant Blankenship's attorney Gambill made statements to the effect that it was "immaterial" to him what others said about Claude Johnson and that he didn't "have to have nobody to give his character." When questioned by the trial judge about the basis for his testimony regarding Johnson's character, Gambill responded that it was based upon his "opinion." While taken in isolation this comment might seem to require the exclusion of Gambill's testimony as violative

of the North Carolina rule prohibiting proof of character based upon personal opinion rather than reputation,[1] we note the following testimony which the defendants did *not* quote in their briefs. The trial court also asked Gambill whether his testimony was "based in any way upon what you say you may have heard other people say?" Gambill responded: "I have never heard nobody say anything about him having a bad reputation. The only thing I have ever heard of Sebon Johnson doing in my life is taking a little drink of beer or something, and just about anybody has done that. I ain't never known him to do anything out of the way to nobody." Furthermore, Gambill testified as follows during cross-examination by defendant Sidden's counsel:

Q: You say you have never heard anybody discuss his general character and reputation at all?

A: I've heard people talking about him up there, but not— I've never heard nobody give him no bad character.

Q: Have you ever heard anybody give any good character either, have you?

A: Oh, yes, quite a few.

. . . .

Q: Where did you hear them give good character references?

A: I've heard it up around there at my brother's store—in the community up there.

We think that considering Gambill's testimony in its entirety, it is plain that Gambill was familiar with Claude Johnson's reputation in the community and that his testimony as to Johnson's character was based upon this reputation. We therefore hold that the trial judge correctly overruled defendants' objection to Gambill's testimony.

---

1. The new North Carolina Rules of Evidence, which apply to actions and proceedings commenced after 1 July 1984, did not govern the trial of these defendants which began on 2 April 1984. 1983 N.C. Sess. Laws Ch. 701, § 3. We note, however, that Rule 405 effects a change in the permissible methods of proving character. Rule 405(a) provides that proof of character "may be made by testimony as to reputation or by testimony in the form of an opinion." N.C. R. Evid. 405(a). *See also* N.C. R. Evid. 608(a).

[2]  By this same assignment of error, the defendants attack the reputation testimony offered by prosecution witness Thurman Holloway. Mr. Holloway testified, in pertinent part, as follows:

Q: Mr. Holloway, do you know Claude Junior Johnson, or Sebon Johnson?

A: Yes, I do.

Q: How long have you known him?

A: Well, I've known him all of his life.

Q: And do you know his general character and reputation in the community in which he's lived or worked?

A: Yes.

Q: What is it?

A: Well, he worked for me quite a bit . . .

MR. GRAY: Move to strike.

COURT: Overruled.

Q: Go ahead.

A: And I found him dependable.

MR. GRAY: Move to strike.

COURT: Motion denied.

Q: Go ahead, sir.

A: And he's truthful.

MR. GRAY: Move to strike.

COURT: Motion denied.

Q: Go ahead, sir.

A: And that's the better part of it.

MR. GRAY: Object. Move to strike.

MR. WHITLEY: Objection. Move to strike.

COURT: I didn't understand the last statement.

WITNESS: I said that was the better part of it. He's truthful and honest.

COURT: Motion denied.

MR. ASHBURN: No further questions.

The defendants here argue that the trial judge erred in overruling their objections to this testimony because the proper method of qualifying character witnesses proffered to give reputation evidence was not followed. They argue that Holloway should not have been permitted to specifically describe Johnson's character traits without first stating categorically what Johnson's reputation was.

We acknowledge that the defendants' argument is technically correct. Established case law[2] provides that

> when an impeaching or sustaining character witness is called, he should first be asked whether he knows the general reputation and character of the witness or party about which he proposes to testify. This is a preliminary qualifying question which should be answered yes or no. If the witness answer it in the negative, he should be stood aside without further examination. If he reply in the affirmative, thus qualifying himself to speak on the subject of *general* reputation and character, counsel may then ask him to state what it is. This he may do categorically, i.e., simply saying that it is good or bad, without more, or he may, of his own volition, but without suggestion from counsel offering the witness, amplify or qualify his testimony, by adding that it is good for certain virtues or bad for certain vices.

*State v. Hicks*, 200 N.C. 539, 540-41, 157 S.E. 851, 852 (1931). *See also State v. McEachern*, 283 N.C. 57, 194 S.E. 2d 787 (1973); *State v. Abernathy*, 295 N.C. 147, 244 S.E. 2d 373 (1978).

While we agree with defendants that Holloway should have been required to state that Johnson's reputation was "good" before proceeding to enumerate the character traits which accounted for Johnson's good reputation, we are convinced that no reversible error was here committed by the failure to follow this procedure. It is clear from Holloway's assessment of Johnson's character that he thought Johnson's reputation in the community was "good." Furthermore, we note that no less than 13 witnesses

---

2. *But see* N.C. R. Evid. 404, 405 and 608 (effective 1 July 1984).

testified as to Johnson's "good" reputation in the Hays Community. The jury therefore heard time and again testimony of the same import as that offered by Thurman Holloway from witnesses who were, in fact, properly examined in accordance with the *Hicks* rule. We therefore hold that despite technical merit in defendants' contention, this assignment of error is overruled.

[3] The defendants' next argument concerns the testimony offered by Thelma Garwood and Herbert Gambill as to Claude Johnson's good character. The basis of this assignment of error is that the trial judge erred in denying motions to strike their testimony because "neither had sufficient knowledge of Johnson's present reputation upon which to rest an opinion."

In *State v. McEachern*, 283 N.C. 57, 67, 194 S.E. 2d 787, 794 (1973), this Court held that before a witness may testify as to another person's reputation, it must be demonstrated that "the testifying witness [has] sufficient contact with that community or society to qualify him as knowing the general reputation of the person sought to be attacked or supported."

Thelma Garwood's testimony on direct examination reveals that she was born and raised in Wilkes County and that she has known Claude Johnson "almost all of [her] life." She further stated that she knew "the general character and reputation of Claude Junior Johnson" in the Hays Community and that it was "very good." On cross-examination, defense counsel elicited from Mrs. Garwood that she had lived in Winston-Salem since 1934. She testified, however, that she "still [owns] property up there" and that she "[goes] back there quite often." Significantly, she also stated that on her frequent visits to Wilkes County she always asks about Johnson. In our estimation, this testimony established that Mrs. Garwood had "sufficient contact" with the Hays Community to afford her "an adequate basis upon which to form [an] opinion" concerning Johnson's general reputation. *McEachern*, 283 N.C. at 67, 194 S.E. 2d at 794.

The defendants also object to the testimony of Herbert Gambill on the basis that Gambill's contacts with Wilkes County were too remote in time to permit his testimony regarding Claude Johnson's present reputation in that area. Mr. Gambill was asked:

Q: Do you know the general character and reputation of Claude Junior Johnson, or Sebon, in the community where he has either lived or worked?

A: Well, I do for the times that I have lived there. I've been away quite a while.

Q: And, what *was* it?

A: It *was* good.

(Emphasis added.)

No objection was made, and the witness was cross-examined.

When on cross-examination Herbert Gambill indicated he had not lived in the Hays Community since 1961, the defendants moved to strike the character evidence given on direct. However, we rule that defendants waived any error in the admission of Gambill's reputation testimony by their failure to object on direct examination when it became clear that Gambill's testimony was not based on an assessment of Johnson's present reputation.

Before stating any opinion regarding Johnson's reputation, Gambill said that it had been quite a while since he had lived in the community. The defendants were required to object as soon as the witness's inability to testify as to Johnson's *present* reputation became known. *See* 1 Brandis on North Carolina Evidence § 27 (1982) and cases cited therein. By failing to do so, defendants waived appellate review of the admissibility of this evidence.

[4] The defendants' third assignment of error is that the trial judge erred by allowing SBI Agent Kenneth Sneed, on rebuttal, to testify that defense witness George Torrealba was known as "a large dealer in controlled substances, including marijuana and co-caine." The defendants object to this testimony on two grounds: (1) that the State failed to present evidence that Sneed had suffi-cient contacts with Wagram, North Carolina, the community in which Torrealba lived, to qualify him as knowing the general reputation of Torrealba in that community; and (2) that through the admission of this testimony, the State was allowed to in-troduce extrinsic evidence of specific bad acts, i.e., drug dealing, by "dressing it up as reputation evidence."

As to the defendants' first objection to Sneed's testimony, our review of the transcript convinces us that the witness was qualified under the *McEachern* standard to offer testimony regarding Torrealba's reputation in Wagram. Sneed explained on direct examination that he was a Special Agent with the North Carolina State Bureau of Investigation. He stated that he was assigned to Richmond and Scotland Counties. Wagram is located in Scotland County. Sneed further testified that he has known George Torrealba for "approximately seventeen or eighteen years" and that he was familiar with "the general character and reputation of George Torrealba in the community in which he lives." While the record is silent as to whether Sneed himself lived in Wagram, it is not essential that the witness have acquired knowledge of a person's reputation in the course of his own residence in the community. We have held that a stranger who has investigated a person's reputation in a recognized community or group may testify to the result of the investigation. *State v. Steen*, 185 N.C. 768, 117 S.E. 793 (1923). *See also State v. Cole*, 20 N.C. App. 137, 201 S.E. 2d 100 (1973); *State v. Moles*, 17 N.C. App. 664, 195 S.E. 2d 352 (1973).

We likewise find no merit in the defendants' argument that the trial court erred in allowing Agent Sneed spontaneously to explain his conclusion that Torrealba had a bad reputation because "he is known as a large [drug] dealer." The *Hicks* rule, which was discussed previously in this opinion, permits the impeaching witness, after he has given a categorical answer regarding reputation, *of his own volition* to describe in what respect a person's reputation is good or bad.[3] *Hicks*, 200 N.C. at 541, 157

---

3. Again, we refer the reader to the North Carolina Rules of Evidence which were inapplicable to the trial of this action. Rule 608 provides, in part, that:

(a) *Opinion and reputation evidence of character.* — The credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion as provided in Rule 405(a), but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(b) *Specific instances of conduct.* — Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of

S.E. at 852. This is precisely what happened in the instant case; Sneed stated that Torrealba had a bad reputation and then, without prompting by the prosecutor, offered testimony of his reputation for dealing in controlled substances. Sneed's testimony describing Torrealba's bad reputation is similar to reputation evidence approved by this Court in *State v. Mills*, 235 N.C. 226, 69 S.E. 2d 313 (1952) and *State v. McLawhorn*, 195 N.C. 327, 141 S.E. 883 (1928). In those cases, no error was found in the admission of volunteered testimony by character witnesses that another person's reputation was bad for making and selling whiskey.

We hold that the trial judge correctly permitted Agent Sneed to testify that George Torrealba had a bad reputation in Wagram and that he was known as "a large dealer in controlled substances."

## Defendant Sidden

[5] We next consider the defendant Sidden's argument that he was denied a fair trial by the State's failure during pretrial discovery to attribute the statement "Let's go Blondie, I think we've got him now" to the defendant Blankenship rather than to the defendant Sidden.

It is difficult to determine from the defendant Sidden's brief the precise basis of his argument on this point. It appears, however, that defendant Sidden filed a post-verdict motion for appropriate relief in which he argued that if in its compliance with the discovery order the State had attributed the statement to the defendant Blankenship, the defendant Sidden would have been entitled to severance under N.C.G.S. § 15A-927(c)(1). That statute requires the prosecutor to select one of three courses of action (one of which is to try the defendants separately) "[w]hen a defendant objects to joinder of charges against two or more defendants for trial because an out-of-court statement of a codefendant makes reference to him *but is not admissible against him.*" (Emphasis added.) Judge Long denied the defendant Sidden's motion for ap-

---

truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

N.C. R. Evid. 608.

propriate relief, ruling that "even if the State had been able to identify who may have made the statement, and if it had been identified as a statement of the defendant Blankenship, that the defense of either defendant would not have been entitled to sanitize that statement, it being a part of the *res gestae* and not a part of any out of court confession or declaration against interest which tends to implicate a co-defendant."

We note initially that in his pretrial statement Claude Johnson did not specifically attribute the statement to either defendant. Johnson simply stated that during the scuffle which took place outside the tool shed on the evening of 21 July 1982, he heard someone say, "Let's go Blondie, I think we've got him now." In that same statement, however, Johnson referred to the defendant Blankenship as "Blondie." It was therefore reasonable for both defense counsel and the State to assume at that point that defendant Sidden was the individual who made the statement. At trial, however, Johnson testified that defendant *Sidden* was known by those in the Hays Community as "Blondie." Although Johnson still did not specifically attribute the statement to either defendant, it then appeared, at least inferentially, that defendant Blankenship had been the one who shouted this statement outside Johnson's window on the evening of 21 July.

Be that as it may, we agree with Judge Long that defendant's argument is without merit because the statement would have been admissible against the defendant Sidden even had he been tried separately from defendant Blankenship. The provisions of N.C.G.S. § 15A-927 are intended to protect a defendant's sixth amendment right of confrontation and cross-examination which, because of the privilege against self-incrimination, may be lost when a co-defendant's statement, inadmissible against but implicating the defendant, is admitted into evidence against the co-defendant at a joint trial. *See Bruton v. United States*, 391 U.S. 123, 20 L.Ed. 2d 476 (1968). These considerations do not apply to the instant case, however, as the statement would have been admissible at the defendant Sidden's trial if he had been tried separately. Johnson's statement that he heard one of the perpetrators of the crime say "Let's go Blondie, I think we've got him now" is not hearsay because it does not contain an assertion by a person other than the testifying witness, Johnson, which was offered to prove the truth of the matter asserted. *See* 1 Brandis on

North Carolina Evidence § 138 (1982) and cases cited therein. Rather, Johnson's statement is his description of the "oral statements attending and connected with the transaction in question," *id.* at § 158, and thus is a part of the *res gestae.*

Even if we construed the statement to be hearsay because it was an assertion that the name of the person accompanying the declarant was Blondie, this Court has held that a hearsay statement which is part of the *res gestae* is admissible as an exception to the hearsay rule. In *State v. Connley*, 295 N.C. 327, 245 S.E. 2d 663 (1978), *judgment vacated on other grounds*, 441 U.S. 929, 60 L.Ed. 2d 657 (1979) we quoted with approval the following statement of the concept of *res gestae* from Underhill's Criminal Evidence § 266, p. 664 (5th ed. 1956):

> Circumstances constituting a criminal transaction which is being investigated by the jury, and which are so interwoven with other circumstances and with the principal facts which are at issue that they cannot be very well separated from the principal facts without depriving the jury of proof which is necessary for it to have in order to reach a direct conclusion on the evidence, may be regarded as res gestae.
>
> These facts include declarations which grow out of the main fact, shed light upon it, and which are unpremeditated, spontaneous, and made at a time so near, either prior or subsequent to the main act, as to exclude the idea of deliberation or fabrication. A statement made as part of res gestae does not narrate a past event, but it is the event speaking through the person and therefore is not excluded as hearsay, and precludes the idea of design.

*Connley*, 295 N.C. at 342, 245 S.E. 2d at 672.

The statement therefore would have been admissible against both defendant Sidden and defendant Blankenship had they been tried separately, and the trial judge correctly denied defendant's motion for appropriate relief on the stated basis.

Defendant Sidden raises several additional issues in which he alleges error in various evidentiary rulings and instructions given by the trial judge. He argues that the testimony offered by pros-

ecution witnesses Doreatha Walker and Johnny Wiles regarding Claude Johnson's reputation was improperly received. The basis of the defendant's objection to Doreatha Walker's testimony is that the prosecutor improperly *invited* her to amplify her statement that Johnson's reputation in the Hays Community was "good." We have reviewed the prosecutor's direct examination of Mrs. Walker and we find no support in the transcript for the defendant's argument.

Defendant Sidden's objection to Johnny Wiles' testimony regarding Claude Johnson's good reputation on the ground that it was based upon personal opinion rather than reputation is also without merit. The defendant's challenge is directed to the following portion of Wiles' testimony on direct examination:

Q: How long have you known Claude Junior Johnson?

A: I've known him, I guess, for 25 years.

Q: Do you know his general character and reputation in the community, or in the community where he's worked?

A: I knew him myself, and I never heard anything bad about Sebon.

MR. GRAY: Move to strike.

COURT: On what grounds?

MR. GRAY: It's not responsive, and it calls for a conclusion.

COURT: Overruled. It appears to be relevant.

Q: The question, and listen to my question, do you know the general character and reputation of Claude Junior Johnson in the community there where he lived?

A: Yeah, it was good.

[6] The district attorney was careful to elicit from the witness the categorical conclusion as to Johnson's reputation required by *Hicks*, 200 N.C. 539, 157 S.E. 851. Wiles' testimony respecting Johnson's reputation was therefore unobjectionable. Furthermore, testimony by a witness in a position to have heard discussions of a person's reputation that he has never heard anything bad about the person is testimony of good reputation and is admissible. *See*

1 Brandis on North Carolina Evidence § 110 (1982). This assignment is dismissed.

Defendant Sidden next argues that the trial court erred in permitting the State to offer rebuttal evidence relating to Johnson's good reputation in the community. Again, we find no error. The defense attacked Claude Johnson's character by introducing evidence which tended to show that Johnson had a reputation in Hays for being a drunkard. Russell Walker testified that he had seen Johnson drunk on several occasions and that he appeared drunk on 21 July 1982. The State is always entitled to offer rebuttal evidence to impeach defendant's witnesses or to explain, modify, or contradict defendant's evidence. *State v. Stanfield*, 292 N.C. 357, 233 S.E. 2d 574 (1977). *See also* N.C.G.S. § 15A-1226 (1983) ("Each party has the right to introduce rebuttal evidence concerning matters elicited in the evidence in chief of another party."). The trial judge therefore did not err in allowing the State to present, during rebuttal, additional evidence of Johnson's good character.

[7] The defendant Sidden's next assignment of error is directed to the testimony of Vernon Holloway. Holloway was called by the State during rebuttal to offer impeaching testimony as to the reputation of Russell Walker, the defense witness who testified that Claude Johnson was often drunk and appeared inebriated on the day of the murder. The defendant's objection seems to be that Holloway was allowed to testify that Walker "has quite a bit of drinking problems and he is not real truthful" without being required to state categorically that Walker's reputation was "bad."

We have earlier engaged in a lengthy discussion of the *Hicks* rule which requires that a character witness first proffer a categorical answer regarding an individual's reputation before the witness may proceed to volunteer the specifics of that individual's "good" or "bad" reputation. Admittedly, the district attorney did not follow this rule when he questioned Vernon Holloway regarding Russell Walker's reputation. We find, however, that no reversible error was committed by his failure to do so. While it is true that Holloway did not proffer the magical language that Walker's reputation was "bad," he was clearly *familiar* with Walker's reputation, and his *description* of it leads to no conclusion but that he thought it was "bad." Furthermore, evidence of

Russell Walker's drinking habits also came in through the testimony of another witness. Arlena Sidden testified without objection that Walker was drunk on the day of the murder. Under these circumstances, we hold that the failure of the district attorney to question Holloway in strict conformity with the *Hicks* rule does not constitute prejudicial error.

Defendant Sidden's next assignment of error requires little discussion. Sidden contends that the evidence adduced at trial was insufficient to support a theory that he acted in concert with defendant Blankenship in committing the crime charged, and therefore the trial judge erred in instructing the jury that they could convict Sidden of first degree murder on that theory. We have held that

> [i]t is not . . . necessary for a defendant to do any particular act constituting at least part of a crime in order to be convicted of that crime under the concerted action principle so long as he is present at the scene of the crime and the evidence is sufficient to show he is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime.

*State v. Joyner*, 297 N.C. 349, 357, 255 S.E. 2d 390, 395 (1979). Suffice it to say that Claude Johnson's testimony placed defendant Sidden at the scene of the crime on the night of 21 July 1982, and his testimony further established that Sidden was "acting together" with Blankenship "pursuant to a common plan" to murder Gary Sidden.

Finally, we address defendant's contention that the trial court erred in failing to instruct the jury that not guilty was a possible verdict when he responded to the jury's request "to hear about first and second degree [murder] again." This argument is totally unsupported by the record. Before proceeding to define again the elements of first and second degree murder, the judge explained as follows:

> Members of the jury, the Defendants have each been accused of First Degree Murder. Under the law, and the evidence in this case, it is your duty to return one of the following verdicts as to each Defendant: either guilty of First Degree Murder, or guilty of Second Degree Murder, *or not guilty*.

(Emphasis added.)

We have examined carefully defendant Sidden's remaining assignments of error. We have not undertaken a written evaluation of each of them because they either lack a factual basis of support in the record or are utterly without merit in law.

We therefore hold that defendants Sidden and Blankenship each received a fair trial, free of prejudicial error.

No error.