STATE OF NORTH CAROLINA v. RUBEN SONNY CONNLEY

No. 2

(Filed 14 July 1978)

1. **Criminal Law §§ 73.1, 75— hearsay testimony—basis for finding confession voluntary**
   The trial court erred in allowing an FBI agent to testify over defendant's objection concerning a conversation the agent had with one of defendant's attending physicians shortly after the crime occurred, since such testimony was unmistakably hearsay and was the basis for the court's finding that defendant was not under medication or sedation, could be talked to concerning the matters that occurred earlier at the crime scene, and answered the FBI agent's questions knowingly, understandingly and voluntarily.

2. **Criminal Law § 75.12; Constitutional Law § 49— right to counsel not waived—statements improperly admitted**
   The trial court erred in concluding that defendant waived his right to counsel where defendant specifically refused to sign a waiver, there was no showing of an oral waiver, and a waiver could not be presumed from defendant's silence; therefore, defendant is entitled to a new trial, since his statements were admitted in violation of his constitutional right to have counsel present at his in-custody interrogation, and it cannot be said that there was no reasonable possibility that the evidence obtained at the interrogation contributed to defendant's conviction.

3. **Criminal Law § 5— insanity—burden of proof on defendant—test**
   The rule that a defendant pleading insanity has the burden of proving that at the time of the crime he lacked capacity to know the nature and quality of his act or to distinguish between right and wrong in relation to it, the M'Naghten rule, remains the test of criminal responsibility in this State.

**4. Criminal Law § 69— radio communications—admissibility analogous to telephone conversations**

Radio communications, by analogy to telephone conversations, are governed by the rules of evidence regulating the admission of oral statements made during a face-to-face transaction, once the identity of the speakers is ascertained.

**5. Criminal Law § 73.4— radio transmissions—hearsay testimony—res gestae—transmissions in regular course of business**

In a prosecution for first degree murder where defendant abducted a Virginia State Trooper at gunpoint and forced the Trooper to carry him in the Trooper's car to Georgia, radio transmissions by the Trooper concerning his predicament and defendant's threats, though hearsay, were properly admitted into evidence, since they were part of the *res gestae*, and since they were made in the regular course of business and in the midst of the transaction the Trooper was reporting.

**6. Criminal Law § 73— double hearsay—admissibility**

In a prosecution for first degree murder of a Virginia State Trooper whom defendant abducted and forced to drive to Georgia, radio transmissions by the Trooper which reported defendant's threat to kill him if anyone attempted to impede their progress to Georgia, though double hearsay, were admissible in evidence since the Trooper, had he survived, could have testified to defendant's statements because they were competent against defendant as admissions, a statement of his mental condition, or a declaration of intent.

ON appeal pursuant to N.C. Gen. Stat. 7A-27(a) (Cum. Supp. 1977) from *Thornburg, J.,* at the 14 March 1977 Special Criminal Session of GRANVILLE.

Defendant, Ruben Sonny Connley, was indicted under G.S. 15-144 (Replacement 1975) for the murder of Garland W. Fisher, a Virginia State patrolman.

At trial the State offered evidence which tended to show the following facts:

According to defendant's statement he left Atlanta, Georgia, on 14 November 1976 and drove his car to Baltimore, Maryland, for the purpose of eluding "people" whom he believed to be following him. Before leaving Atlanta, defendant purchased a .38 caliber revolver to protect himself from his pursuers. After spending approximately an hour visiting friends in Baltimore he left to return to Atlanta. When defendant observed an unmarked Virginia State Police car on Interstate Highway 85 near McKenney, Virginia, at about 11:00 p.m. that night, he turned his automobile around and headed north in the southbound lane, intending to "stop the trooper because [defendant] was being pursued by people."

When defendant found the Virginia patrol car, driven by Patrolman Garland W. Fisher, he got out of his car and said to him, "I was fixing to come get you to lock me up." In the course of their conversation defendant told Fisher about his gun, the .38 caliber revolver. Whereupon, the officer told defendant he would have to surrender his gun before defendant could get into the police car. To this statement defendant replied, "You keep yours and I will keep mine. When we get to jail, you can keep both of them." At this point Fisher attempted to wrest the gun from defendant, but in the ensuing struggle, defendant removed the trooper's .38 caliber service revolver from its holster. As he did, the gun discharged, wounding Fisher in the shoulder. Defendant then forced him to get into his patrol car and drive it southward toward Atlanta. Sometime after 11:40 p.m. defendant permitted Fisher to radio his dispatcher three times in order to inform the authorities of his situation and to warn them against interfering with his progress to Atlanta.

As defendant and Fisher proceeded southward several patrolmen from Virginia and North Carolina, having been informed of Fisher's abduction by radio, gradually formed a small convoy behind his vehicle. Virginia Patrolman J. L. Crowder was immediately behind it. He was followed by Troopers W. H. Terry and F. H. Clark, Jr., of Virginia. Then came Sergeant Raines and Trooper J. M. Smith of Virginia, Patrolman C. G. Todd of North Carolina and, finally, North Carolina Patrolman D. H. Matthews. After Patrolman Crowder first pulled his cruiser behind it, the "target vehicle" did not stop until it encountered a roadblock.

While the convoy was proceeding south, North Carolina Patrolman R. P. Williams parked his patrol car about a mile north of N.C. Highway 56 on a wooded median strip so as to conceal it from southbound traffic. Then, with assistance from fellow officers D. M. Terrell and D. F. King, Williams created a roadblock by causing a tractor-trailer rig to park diagonally across the southbound lanes with its cab facing the median. Having blocked the road, the patrolmen took cover to await the arrival of Fisher's patrol car. Trooper Williams, armed with a State-issued 12 gauge shotgun, positioned himself behind the rear end of the trailer.

As Fisher's patrol car approached the roadblock it slowly pulled onto the right-hand shoulder as if to pass around the truck. When the approaching car came within 25 feet of the rear of the trailer, Williams raised his shotgun and fired into the center of its windshield. The Virginia patrol car stopped within 15 feet of

Williams, who stepped forward to examine it. Gunfire immediately erupted from inside the vehicle; several witnesses heard from four to six shots emanate from Fisher's car and saw muzzle flashes near the middle of the seat. Williams again "took aim and fired through the left side of the vehicle attempting to shoot into the back seat where it appeared to [him] the gunshots came from." Williams testified that the passenger, whom he had first seen seated by the driver, was no longer in view. The officer next fired through the windshield just to the left of center and then, from a crouching position, fired from the hip, attempting to shoot into the back door. Thereafter, he retreated behind Sergeant Bailey's patrol car, which had been driven past the Fisher vehicle and stopped near the truck on the right-hand shoulder of the southbound lanes of I-85.

Contemporaneously with the first exchange of gunfire, the patrolmen in the convoy pulled their vehicles into positions near Fisher's unmarked patrol car and assumed vantage points behind them from which to shoot. After Patrolman Williams returned to cover, Sergeant Bailey used his public address system to direct the other patrolmen to shoot the tires on the Fisher automobile. After the tires were thus deflated, the officers held their fire while Patrolman Matthews crawled from his car to the back of Fisher's automobile and attempted to look through the rear window. It was too dark to see inside; so Matthews returned to his car, drove past Fisher's automobile, and then made a U-turn so as to project his headlights into it.

The headlights revealed the man behind the wheel to be a white male. When he did not move, Matthews crawled to the door and observed that the man wore the arm patch of a trooper. He had a gaping hole in his left cheek. Matthews then shone his flashlight inside the car and saw a black male, later identified as Ruben Sonny Connley, kneeling or squatting on the front floorboard on the passenger's side. When the black man pointed a revolver toward him Matthews dropped to the ground and crawled back to his vehicle. Using his public address system Matthews informed Sergeant Bailey that the driver-trooper appeared dead, but that the passenger was alive and armed.

Matthews volunteered to get the armed man out. After extinguishing his headlights, he crawled to within 20 feet of the passenger's side of Fisher's car and called to the black man to come out with his hands up. Receiving no response, Matthews moved to within 10 feet of the door, drew his .357 Magnum Colt,

and fired six rounds into the door in a shot group which covered the man's position on the floorboard.

After reloading his pistol, Matthews raised his flashlight and checked the back seat of the vehicle. It was empty. He then peered into the front of the car and saw the defendant lying unconscious, the trunk of his body hunched onto the seat. In his right hand defendant grasped a shiny .38 caliber pistol; a .22 caliber pistol lay underneath the heel of the same hand. Matthews reached in through the shattered window on the passenger's side and removed these weapons as Sergeant Bailey and Tooper Todd came up behind him. Officers Bailey and Todd pulled the defendant from the car and removed a cocked and loaded .38 caliber blue-steel revolver from his person. This gun, which was later sent to the SBI lab in Raleigh for examination, was placed with the other two. Other patrolmen approached the car to render Trooper Fisher aid but could find no pulse in his body. Defendant and Fisher were taken by ambulance to the emergency room of Duke Medical Center in Durham. Later, Trooper Fisher's body was removed to Memorial Hospital in Chapel Hill, where it was examined by the Chief Medical Examiner of North Carolina.

Dr. Wilton M. Reavis, Jr., a forensic pathologist on the staff of the Chief Medical Examiner, gave expert testimony based on the autopsy he had performed on Fisher's body. It was Dr. Reavis's opinion that the trooper had sustained at least 14 gunshot wounds. Any one of four of these, wounds Nos. 4, 5, 11 and 12, could have been fatal. Wound No. 4 resulted from a projectile which entered Fisher's right side, passed upward through the body at an angle of approximately 45 degrees, and exited the back near the left armpit. The projectile causing wound No. 5 entered slightly above Fisher's waistline on his right side, traveled upward at an angle of approximately 45 degrees and lodged in the back just beneath neck. After its removal this bullet, State's Exhibit No. 17, was turned over to the SBI. The gunshot causing wound No. 11 entered on the right side of Patrolman Fisher's neck and came out on his left cheek just below the eye. The point of entry for the bullet causing wound No. 12 was only two inches from the entry hole of wound No. 11, and the bullets causing these two wounds apparently exited the body at the same place. A small metal fragment, State's Exhibit 19, was recovered from entry wound No. 12 and given to SBI agents.

Numerous lead cases, bullet fragments, and spent cartridges collected by SBI Special Agent Douglas Branch from various loca-

tions in and around Fisher's unmarked car were submitted to Examiner Stephen T. Carpenter, an expert in firearm identification employed by the SBI. Mr. Carpenter compared these materials, along with the fragments received from Dr. Reavis, against test items fired from three guns: (1) Patrolman Matthews' .357 Magnum Colt (State's Exhibit 5); (2) the R. B. Industries, Model R. J. 31, .38 caliber revolver with a four-inch barrel removed from defendant's person by Sergeant Bailey (State's Exhibit No. 6); and (3) the Smith & Wesson, Model 10-5, .38 caliber special revolver with a two-inch barrel taken from defendant's hand by Trooper Matthews (State's Exhibit No. 7).

Based on his ballistic examinations, Mr. Carpenter testified that State's Exhibit No. 17 was the only projectile associated with one of the potentially lethal wounds which could be identified. In his opinion that bullet was fired from State's Exhibit No. 6, the R. G. 31, .38 caliber revolver taken from the defendant. Mr. Carpenter also analyzed the fabric of the jacket and shirt Trooper Fisher had been wearing when he was shot for traces of gunpowder and lead wipings. Based on the quantity of gunpowder and singed fabric detected, it was Carpenter's opinion that the holes in the jacket which corresponded to the entry holes of the bullets inflicting fatal wounds Nos. 4 and 5 were caused by projectiles fired from a distance of six inches or less.

Other than immaterial testimony from a member of the ambulance crew, defendant's only evidence came from two psychiatrists, Dr. Billy W. Royal and Dr. Robert Harper. Dr. Royal, a member of the staff of Dorothea Dix Hospital, first examined defendant on 3 February 1977. In his opinion, defendant was able to determine right from wrong at that time and, at the time of the trial, was "able to work with an attorney in terms of his defense" and to determine right from wrong. He had no opinion as to defendant's state of mind or whether defendant knew right from wrong at the time of the roadblock on the early morning of 15 November 1976. It was his opinion that defendant "has a paranoid personality and on occasions . . . might have frank delusions of hallucinations or be psychotic, and that it was a more or less chronic problem with the patient."

Dr. Robert Harper, a psychiatrist engaged in private practice in Raleigh, examined defendant for about two hours on 5 March 1977 after having studied the report of Dr. Royal's examination. In consequence, Dr. Harper formed the opinion (1) that defendant "suffered from paranoid schizophrenia," and was subject to delu-

sions; (2) that "at the time defendant took the State Trooper, Garland W. Fisher, hostage . . . he knew it was wrong"; and (3) that "when confronted with the roadblock and attendant circumstances in the early morning hours of November 15, 1976 . . . in spite of the fact that he was operating in a delusional state and was psychotic . . . [defendant] still knew the difference between right and wrong."

At the conclusion of counsel's arguments to the jury the court, in a bifurcated charge, submitted to the jury the following issues: (1) "Did the defendant kill the deceased?" and (2) "If so, was the defendant insane when the killing occurred?" Upon concluding their deliberations the jury returned to the courtroom and announced their verdict that defendant killed Trooper Fisher, and that he was sane when he did it. The trial judge then explained the elements of first and second degree murder and instructed the jury to return either a verdict of guilty as to one of these offenses or a verdict of not guilty. The jury returned a verdict of guilty of first degree murder. Judge Thornburg sentenced defendant to life imprisonment and defendant appealed.

Additional facts will be stated in the opinion as necessary.

*Rufus Edmisten, Attorney General, and Lester V. Chalmers, Jr., Special Deputy Attorney General, for the State.*

*Hugh M. Currin and John H. Pike for defendant appellant.*

SHARP, Chief Justice.

The assignments of error which defendant brings forward challenge the admission of certain portions of the State's evidence and the court's instructions to the jury.

We first consider defendant's contention that the trial judge committed prejudicial error by permitting State's witness Victor Holdren, a special agent with the Federal Bureau of Investigation, to testify about statements which defendant made to him in the emergency room at Duke Medical Center between 4:00 and 5:00 a.m. on 15 November 1976. These statements, the substance of which Holdren related to the jury, included defendant's explanation of the circumstances which prompted his trip from Atlanta to Baltimore on 14 November 1976 and the details of his initial en-

counter with Trooper Fisher. Other statements made by defendant during this interview dealt with his ride from McKenney, Virginia, to the road block in North Carolina. Often quoting defendant verbatim, Agent Holdren recounted the substance of their conversation in his testimony to the jury. His testimony, except when summarized, is quoted below:

After defendant forced Fisher into his patrol car, defendant "told the trooper, 'Drive me to Atlanta, to the Atlanta Police Department and you are free.'" As they drove south defendant "allowed the trooper to use the radio and talk to his headquarters. Connley said he also talked on the radio but wouldn't tell me [Holdren] what the conversation was. He said they continued along Interstate 85 into North Carolina and came to a road block made up of a tractor-trailer across the road. He said he saw a number of people around the tractor-trailer and when the car stopped, the officers began shooting at their car and Trooper Fisher hit his arm and appeared to be trying to get out of the car. He [defendant] stated and I quote: 'I was shooting at the dude on top of the trailer and don't know if I shot the trooper or not.' I questioned him how many times he had fired his gun. He didn't recall but he said that he fired the guns he had in his possession which included his gun, a .38 caliber revolver and the trooper's gun. He told me that his gun held 5 rounds of ammunition. He said everything went off pow, pow, pow, pow. At this point I was trying to determine if he had in fact shot Officer Fisher. I asked him if he had been allowed to continue to Atlanta, Georgia, would he have shot Fisher and he replied quote 'No, I wouldn't have. I'm sorry, no.' Mr. Connley said that during the drive from Virginia to the road block he and Trooper Fisher talked about life in general." At that point defendant terminated the conversation.

For the reasons hereafter stated, defendant's assignment of error based upon his exceptions to the foregoing testimony must be sustained and a new trial granted.

When Special Agent Holdren was called as a witness and asked to recount his conversation with defendant, the court, *ex mero motu*, conducted a voir dire to determine the competency of that testimony. Only Agent Holdren testified; defendant offered no evidence. Upon completion of the voir dire the trial judge entered findings of fact upon which he concluded (1) that defendant waived his right to an attorney and his other constitutional rights as explained by Officer Holdren; (2) that defendant "knowingly, understandingly, and voluntarily . . . intelligently and intentional-

ly answered" Holdren's questions; (3) that his statements were "made with a full understanding" of his constitutional rights; and (4) that these statements should be admitted into evidence against him.

[1]   On voir dire Holdren testified that he in no way coerced, or attempted to coerce, defendant into giving a statement; and that he made no threat or promise nor offered defendant any hope of reward. He "observed that Mr. Connley was alert and responded to questions in a normal, rational way." Holdren also told the court that before interviewing defendant he had spoken with Dr. W. R. Belts, one of defendant's attending physicians. Whereupon the State's attorney who was examining Agent Holdren propounded this question, "And what advice was given to you by Dr. Belts?"

The court overruled defendant's objection to the question and Holdren answered: "I was concerned about whether he [defendant] would be able to talk to me. He [Dr. Belts] described Mr. Connley as having been treated for a gunshot wound in the left chest area and the right hand and apparently what he thought was a bullet crease across his left knee. He said that Connley was in a stable condition; that he had recieved no medication to sedate him at all, and that he was alert and entirely capable of talking to me about this."

The admission of this testimony from Agent Holdren was, of course, error. It was unmistakable hearsay which was not within any exception to the general rule rendering hearsay incompetent and inadmissible evidence. Patently, this testimony was the only basis for the court's finding that "FBI Agent Victor Holdren went to the hospital and talked with one of Connley's attending physicians; that at this time, he was advised by the doctor that Connley was not under medication and sedation, and that he could be talked with concerning the matters that occurred at the previous evening and early morning hours." It is equally obvious that the incompetent hearsay also supported the court's finding that defendant's answers to Holdren's questions were "knowingly, understandingly, voluntarily . . . willingly and intelligently and intentionally" made. The only other evidence tending to support that finding was Holdren's testimony that Connley "was alert and responded to the questions in a normal, rational way" when the agent talked to him.

"Unquestionably it is the rule in this jurisdiction that a judge's findings of fact will be reversed where it affirmatively appears they are based in whole or in part upon incompetent evidence. . . . However, 'in the absence of words or conduct indicating otherwise, the presumption is that the judge disregarded incompetent evidence in making his decision.'" *State v. Davis*, 290 N.C. 511, 541-42, 227 S.E. 2d 97, 115 (1976). However, "this presumption is weakened when, over objection, the judge admits clearly incompetent evidence." *Ibid.* Defendant argues that the admission of this testimony requires a new trial. Because the record in this case reveals other error requiring a new trial, we need not determine whether the court's finding as to what Dr. Belts told Holdren with reference to defendant's condition constituted prejudicial error. *See State v. Patterson*, 288 N.C. 553, 566-67, 220 S.E. 2d 600, 610 (1975).

[2] The trial court's conclusion that defendant waived his right to counsel was based upon the following factual findings:

"[T]hat while the defendant did not specifically make the affirmative statement that he did not have a desire, that he did not desire to have an attorney present, he nevertheless fully was advised of his rights to have an attorney present and knew and understood his right to have an attorney present and knew and understood his right to have an attorney present before he answered any questions put to him by Officer Holdren.

"And the Court finds as a fact from the totality of these surrounding circumstances that he did in fact waive his right to an attorney and his other constitutional rights. . . ."

On voir dire Holdren had testified that he approached defendant in the emergency room and asked him if he would talk. Defendant said he would, and Holdren informed defendant of his constitutional rights, reading the Miranda warning from a form entitled "Interrogation and Advice of Rights." This form also contained a "waiver of rights" section, under which was a line for defendant's signature. Additionally Holdren gave defendant a copy of the form and told him to read it for himself. The agent then asked defendant if he understood his constitutional rights and defendant replied, "I know what it says and I understand, but I'm not going to sign it." The record discloses no further statement by defendant bearing upon his rights. He did not sign the form.

State v. Connley

Although a trial judge's findings of facts are binding upon appellate courts when supported by competent evidence, whether such evidence supports the findings and whether the findings themselves support the court's conclusions are questions of law reviewable on appeal. *State v. Thompson*, 287 N.C. 303, 214 S.E. 2d 742 (1975); *State v. Pruitt*, 286 N.C. 442, 212 S.E. 2d 92 (1975). The findings in this case, quoted above, are insufficient to support the conclusion that defendant waived his right to counsel. Defendant unequivocally refused to sign a waiver, and Holdren's testimony on voir dire fails to show a specific oral waiver. As this Court said in a recent case involving similar findings:

"Measured by *Miranda* standards it is apparent that the findings of fact are not supported by the voir dire testimony of Agent Martinez. Failure to request counsel is not synonymous with waiver. Nor is silence. . . . The trial judge erred in holding that since defendant had been fully informed and understood his right to the presence of counsel at the in-custody interrogation and did not request a lawyer, his act in making the statement amounted to a waiver of counsel." *State v. Butler*, 295 N.C. 250, 255, 244 S.E. 2d 410, 413 (1978).

As we have frequently noted, the Supreme Court said in *Miranda v. Arizona*, 384 U.S. 436, 470, 16 L.Ed. 2d 694, 721, 86 S.Ct. 1602, 1626 (1966), that a waiver must be explicit and cannot be presumed from silence:

"An individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we have delineated have been given. . . ."

In *State v. Blackmon*, 280 N.C. 42, 49-50, 185 S.E. 2d 123, 128 (1971), this Court ordered a new trial because there was no evidence that the defendant expressly waived his right to counsel. "Although the evidence at the *voir dire* is ample to support a finding that the defendant made the statements in question freely and voluntarily, having been fully advised of and having full understanding of his right to have an attorney present, the plain language of the *Miranda* decision above quoted in addition requires a waiver of right to counsel knowingly and intelligently

made by defendant. '. . . [F]ailure to ask for a lawyer does not constitute a waiver.' " We reiterated this principle in Blackmon's second appeal, *State v. Blackmon*, 284 N.C. 1, 9-10, 199 S.E. 2d 431, 437 (1973), and have noted or applied it in other decisions. *See State v. Lawson*, 285 N.C. 320, 204 S.E. 2d 843 (1974); *State v. Thacker*, 281 N.C. 447, 189 S.E. 2d 145 (1972); *State v. Turner*, 281 N.C. 118, 187 S.E. 2d 750 (1972); *State v. Hudson*, 281 N.C. 100, 187 S.E. 2d 756 (1972), *cert. denied* 414 U.S. 1160.

Since defendant's statements were admitted in violation of his constitutional right to have counsel present at his in-custody interrogation, a new trial must be granted because we cannot say that there was no reasonable possibility that the evidence complained of contributed to defendant's conviction. *State v. Chapman*, 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967); *State v. Thacker*, supra; *State v. Hudson*, supra; *State v. Taylor*, 280 N.C. 273, 185 S.E. 2d 677 (1972). The most hotly contested issue in this case was whether Fisher was killed by defendant or by the law enforcement officers who fired into the patrol car in attempting to rescue him. The import of Agent Holdren's testimony was that defendant first said he did not know whether he shot Fisher; that he later said he could have shot him; and that he finally said he was sorry, because he would not have shot Fisher had they been allowed to continue to Georgia. It cannot be denied that such a quasi confession by an accused would ordinarily make a profound impression upon the minds of the average juror. *See State v. Blackmon*, 280 N.C. 42, 50, 185 S.E. 2d 123, 128 (1971). Therefore, the erroneous admission of defendant's in-custody statements entitles him to a new trial.

[3]   Of the remaining assignments of error only assignment No. 1 raises a question likely to recur at defendant's second trial. Notwithstanding, we note assignment No. 9, which is not an assertion of legal error; it is but a recurring plea to this Court to reverse the rule that a defendant pleading insanity has the burden of proving that at the time of the crime he lacked capacity to know the nature and quality of his act or to distinguish between right and wrong in relation to it. Defendant concedes that this test, known as the M'Naghten rule, has "existed in North Carolina for well over a century." *State v. Helms*, 284 N.C. 508, 201 S.E. 2d 850 (1974). He argues, however, that the rule is "incommensurable" with present psychiatric thinking, "archaic and

unyielding," and places an "insurmountable" burden upon a defendant. We again reject this argument.

In recent years we have repeatedly reaffirmed our adherence to the M'Naghten rule; we now do so again. Although the science of psychiatry has made great strides since *M'Naghten's Case*, in our view, the psychiatrists have offered nothing better than the standard it established. As Justice Huskins, speaking for the Court, said in *State v. Helms*, 284 N.C. 508, 514, 201 S.E. 2d 850, 854 (1975) "[T]he M'Naghten rule is constitutionally sound; and our adherence to it is based on reason and common sense." *Accord, State v. Pagano*, 294 N.C. 729, 242 S.E. 2d 825 (1978); *State v. Willard*, 292 N.C. 567, 234 S.E. 2d 587 (1977); *State v. Harris*, 290 N.C. 718, 228 S.E. 2d 424 (1976); *State v. Taylor*, 290 N.C. 220, 226 S.E. 2d 23 (1976); *State v. Hammonds*, 290 N.C. 1, 224 S.E. 2d 595 (1976).

Further, we again point out, as we did in *State v. Caldwell*, 293 N.C. 336, 237 S.E. 2d 742 (1977), that the decision in *Mullaney v. Wilbur*, 421 U.S. 684, 44 L.Ed. 2d 508, 95 S.Ct. 1881 (1975) did not change our rule that the burden of proof with respect to insanity rests upon the defendant pleading it. *See Patterson v. New York*, 432 U.S. 197, 53 L.Ed. 2d 281, 97 S.Ct. 2319 (1977); *State v. Pagano, supra; State v. Jones*, 293 N.C. 413, 238 S.E. 2d 482 (1977).

Finally, we proceed to defendant's assignment No. 1, which challenges the admission of the testimony of two Virginia State Police Dispatchers, Thomas M. Richardson and Frances C. Houchins, dealing with radio transmissions they received from Trooper Fisher while on duty late in the evening of 14 November 1976 and the early morning hours of November 15th. Both dispatchers knew Fisher and had engaged in radio communications with him prior to November 14th.

Richardson testified that while on duty he received two transmissions before midnight from Trooper Fisher, who identified himself by his coded "batch" number of 1309. He also stated that he heard the substance of a third communication from Fisher which was received by Mrs. Houchins, who relieved Richardson at midnight. Mrs. Houchins testified that she received one communication from unit 1309 and identified the speaker as Patrolman Fisher. When the State sought to elicit from each dispatcher the substance of the broadcasts he or she had heard

(three broadcasts for Richardson and one for Mrs. Houchins), defendant objected. The trial judge overruled defendant's general objection and admitted the following testimony pertaining to the content of the three communications.

(1) Communication received by Richardson at 11:44 p.m., November 14, 1976:

"Q. And what did [Fisher] say to you at that time?

"A. His transmission was . . . 'I have a subject who now has me in his custody. He has my service revolver. He wants me to take him to Atlanta, Georgia, and I am now on Interstate 85, ten miles south of McKenney. I have been shot once.' "

(2) Communication received by Richardson at 11:52 p.m.:

"Q. Would you tell the court what G. W. Fisher told you on this occasion?

"A. His transmission was 1309. 'I am now escorting the subject to Atlanta Police Department.' "

(3) Communication received by Houchins and heard by Richardson at 12:08 a.m., November 1976:

"Q. (To Richardson) And at approximately 12:08 a.m. on the morning of November 15, 1976, what if anything, did Patrolman G. W. Fisher say to you at that time?

"A. (By Richardson) He called in on his radio and Mrs. Houchins, the other dispatcher, was with him at this time. And his transmission was 1309. She said, 'Go ahead.' He said, 'The subject now has both pistols on me. If anybody or any officer hits him, he is going to kill me.'

"Q. (To Houchins) What, if anything, did [Fisher] say to you at 12:09 a.m. on the morning of November 15, 1976?

"A. (By Houchins) He called me, he said, '1309 to Richmond,' and I acknowledged him and then he said, 'Mrs. Houchins, the man in the car with me has two pistols on me. He said if we are interfered with in any

> way, or if he is hit, that he will kill me.' I waited for him to continue and he repeated the same thing over."

Defendant contends that the trial court's admission of this testimony regarding the content of the broadcasts received from Patrolman Fisher constituted reversible error.

[4] Radio communications, by analogy to telephone conversations, are governed by the rules of evidence regulating the admission of oral statements made during a face-to-face transaction, once the identity of the speakers is ascertained. *See Everette v. D. O. Briggs Lumber Co., Inc.*, 250 N.C. 688, 110 S.E. 2d 288 (1959). That the radio messages received by Mr. Richardson and Mrs. Houchins were sufficiently identified as being those of the deceased is undisputed. Accordingly, this assignment of error may be analyzed in light of the general principles of evidence governing hearsay.

[5] Evidence, whether oral or written, is hearsay (1) "when its probative force depends, in whole or in part, upon the competency and credibility of some person other than the witness by whom it is sought to produce it." *State v. Deck*, 285 N.C. 209, 213, 203 S.E. 2d 830, 833 (1974). "Hearsay evidence, unless it falls within one of the recognized exceptions to the hearsay rule, is inadmissible." 1 Stansbury's North Carolina Evidence, § 138 (Brandis rev. 1973). Indisputably, the content of the radio transmissions by Patrolman Fisher was hearsay; the evidence was offered to show (1) that the trooper was being forced to drive to Atlanta and (2) that his armed abductor was threatening to kill him should a rescue be attempted. This testimony, however, falls within two well-established exceptions to the hearsay rule and was therefore properly admitted.

First, Fisher's entire report to the dispatchers—both the stark statement of his predicament and his repetition of defendant's threats—were admissible under the *"res gestae* concept." An excellent general statement of this concept appears in 1 Underhill's Criminal Evidence § 266, p. 664 (5th Ed. 1956), as follows:

"The rule of res gestae, under which it is said that all facts which are a part of the res gestae are admissible, is a rule deter-

mining the relevancy and not the character or probative force of the evidence. If the court determines that the fact offered is a part of the res gestae, it will be accepted, because, as it is said, that fact is then relevant. . . . Circumstances constituting a criminal transaction which is being investigated by the jury, and which are so interwoven with other circumstances and with the principal facts which are at issue that they cannot be very well separated from the principal facts without depriving the jury of proof which is necessary for it to have in order to reach a direct conclusion on the evidence, may be regarded as res gestae.

"These facts include declarations which grow out of the main fact, shed light upon it, and which are unpremeditated, spontaneous, and made at a time so near, either prior or subsequent to the main act, as to exclude the idea of deliberation or fabrication. A statement made as part of res gestae does not narrate a past event, but it is the event speaking through the person and therefore is not excluded as hearsay, and precludes the idea of design."

The res gestae concept was the basis of decision in the following cases:

In *Brown v. State*, 249 Ala. 5, 31 So. 2d 681 (1946) the defendant shot and killed his brother-in-law, Wilkey, in front of the deceased's restaurant after considerable argument in and around the premises. During the course of the disturbance, Wilkey twice telephoned the sheriff and told him that two men armed with a shotgun were outside his place, cursing and threatening to kill him. On the second call he told the sheriff "to get on out here; they are going to kill me." Before the sheriff could get there the defendant did kill Wilkey. Defendant was convicted or murder. On his appeal to the Court of Appeals the conviction was vacated because the trial judge permitted the sheriff to testify about those conversations between the deceased and himself. Upon the State's appeal, the Alabama Supreme Court reversed the Court of Appeals, holding "that the conversation between the deceased and the sheriff superinduced by the menacing presence and threats by the defendant are within the res gestae of the killing, 'substantially contemporaneous with the main fact under consideration, and so closely connected with it as to illustrate its character.' (Citations omitted)" *Id.* at 7, 31 So. 2d at 682.

The case of *Commonwealth v. Coleman*, 458 Pa. 112, 326 A. 2d 387, 74 A.L.R. 3d 954 (1974) is also illuminating. The evidence tended to show that at approximately 6:15 a.m. on 3 May 1971 the deceased telephoned her mother and, in an agitated voice, stated that defendant (her boyfriend) "would not let her leave the apartment, that he would hang up the phone, and that he was going to kill her." When the connection was broken at approximately 6:25 a.m. the girl's mother called the police, as she had been implored to do. At 6:35 a.m. policemen found the girl in her apartment, dead of multiple stab wounds. Defendant appealed his conviction of murder, contending that the trial judge had erred in permitting the decedent's mother to testify for the Commonwealth as to the decedent's statements to her on the telephone. The Supreme Court of Pennsylvania held that decedent's statements to her mother over the telephone were properly admitted in evidence as one of the "res gestae exceptions to the hearsay rule." However, one group of Justices thought the decedent's statements came in as "an exception to the hearsay rule for present sense impressions." The other was "satisfied" that the challenged statements were "admissible under the so-called 'excited utterance' exception, another variant of the res gestae exception." The consensus was that the indicia of reliability for such a declaration is its contemporaneousness with the observation of the occurrence or condition.

Hearsay testimony in *Knight v. State*, 338 So. 2d 201 (Fla. 1976) indicated that the defendant confronted one Mr. Gans in his business parking lot and ordered him, at gunpoint, back into Gans's car. Defendant and Gans returned to the Gans home and picked up Mrs. Gans, whereupon defendant forced the two hostages to drive to a bank. Mr. Gans was instructed to go inside the bank and obtain $50,000 or Mrs. Gans, who remained in the car as hostage, would be killed. Mr. Gans entered the bank and related the situation to Mr. Gill, the bank president, who provided Gans with the money and promptly alerted the FBI and local authorities. Before the law enforcement officers could react, however, Mr. and Mrs. Gans were shot to death. At the defendant's trial for murder Mr. Gill's testimony recounting Mr. Gans's description of the kidnapping and extortion plot was admitted over objection. On defendant's appeal from his conviction of murder, the Supreme Court of Florida held that "[t]he testimony

given by Mr. Gill was admissible as being within the res gestae of the crime of kidnapping. . . . The trial court properly held this evidence admissible as res gestae, an exception to the hearsay rule." *Id.* at 204.

The above cases support this Court's conclusion that the total content of Trooper Fisher's radio broadcasts, including defendant's alleged threats, were admissible under the "res gestae concept." Statements made by a deceased immediately prior to or during the course of a continuing criminal transaction are frequently admitted under this theory. *See generally*, 2 Wharton's Criminal Evidence § 297 (13th Ed. 1972); Annot., 74 A.L.R. 3d 963 (1976). However, admission of Fisher's radio communications, in their entirety, is also supported by other formulations of certain other exceptions to the hearsay rule.

Trooper Fisher's radio reports to the Virginia State Police Control Station for the area through which he was traveling were made "in the regular course of business," and in the midst of the transaction he was reporting. As it was his duty to do, the trooper was informing his headquarters of an extraordinary situation which threatened the public safety, his life, and State property; he and his patrol car were under the control of an armed abductor who had possession of Fisher's weapon. The reasonable probability of the truthfulness of Fisher's report is obvious: (1) Common experience would reject the suggestion that a highway patrolman on duty would falsely report the loss of his service revolver and his forcible abduction. (2) In Virginia (as in North Carolina) to falsely report the commission of a crime with intent to mislead State authorities is a criminal offense. Va. Code § 18.2-461 (Replacement 1975). (3) The subsequent tragedy fully corroborated his report.

[6] Fisher's oral dispatches were admissible for the same reason written entries in the regular course of business are admissible. *State v. Cawthorne*, 290 N.C. 639, 227 S.E. 2d 528 (1976); *Geralds v. Champlin*, 93 N.H. 151, 37 A. 2d 155 (1944). *See* 1 Stansbury's N.C. Evidence § 155 (Brandis rev. 1973); C. McCormick, Evidence §§ 307, 310 (2d Ed. 1978); 93 Univ. of Pa. L. Rev. 101 (1945). Of course, that portion of these dispatches which reported defendant's threat to kill Fisher if anyone attempted to impede their progress to Atlanta is a classic example of "double hearsay."

However, as stated in 2 Jones on Evidence § 8.8 (6th Ed. 1972), "[T]here is no good reason why a hearsay declaration, which within itself contains a hearsay statement, should not be admissible to prove the truth of the included statement, if both the statement and the included statement meet the tests of an exception to the hearsay rule." *See Yates v. Bair Transport, Inc.*, 249 F. Supp. 681, 688 (S.D.N.Y. 1965); 13 U.L.A., Uniform Rules of Evidence § 805 (West 1975). The dispatches challenged here meet this requirement. Had Fisher survived, upon a trial of defendant for kidnapping, or any other offense growing out of the events involved here, he could have testified to defendant's out-of-court statements which are now in question. They would have been competent against defendant either as admissions, a statement of his mental condition, or a declaration of intent. *See* Stansbury's North Carolina Evidence §§ 161, 162, 167 (Brandis rev. 1973).

For the reason set out above the verdict and judgment from which the defendant appeals are vacated and a new trial ordered.

New trial.